47 A.3d 831

**LANCASTER GENERAL HOSPITAL, Appellant**

v.

**WORKERS' COMPENSATION APPEAL BOARD (WEBER–BROWN), Appellee.**

Supreme Court of Pennsylvania.

Argued April 13, 2011.

Decided May 29, 2012.

334

Richard Lynn Hackman Jr., York, Joshua L. Schwartz, W. Jeffrey Sidebottom, Barley Snyder LLC, Lancaster, for Lancaster General Hospital.

William Bradley Gregory, Georgelis Law Firm, P.C., for Janice Weber–Brown.

Amber Marie Kenger, PA Department of Labor & Industry, Richard C. Lengler, Workers Compensation Appeal Board, for Workers Compensation Appeal Board.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice TODD.

In this appeal by allowance, we address the proper method of calculating an hourly-wage claimant's average weekly wage under Section 309 of the Workers' Compensation Act ("the Act"),[1] 77 P.S. § 582, where the specific loss claimant suffers an initial incident, changes employers, and later suffers a work-related injury caused by the initial incident. After careful review, we affirm the decision of the Commonwealth Court.

Janice Weber–Brown ("Claimant") worked for Appellant Lancaster General Hospital ("Lancaster General") as a li-

1. Act of June 2, 1915, P.L. 736 (as amended, 77 P.S. §§ 1 *et seq.*).

censed practical nurse beginning in 1979. Sometime during 1979 or early 1980,[2] Claimant was cleaning the tracheotomy of a patient who was infected with the herpes simplex virus ("HSV"). While Claimant was cleaning the patient's tracheotomy, the patient coughed, causing sputum to spray in Claimant's left eye. Claimant proceeded immediately to Lancaster General's emergency room, where she had her eye flushed, received antibiotics, and was told to see her eye doctor. Approximately two weeks after the incident, Claimant's eye became swollen and infected, and Claimant believed she contracted HSV. Her symptoms subsided with treatment, however, and Claimant did not miss any work with Lancaster General as a result of her eye problems.

Claimant left the employ of Lancaster General in 1985 for reasons unrelated to the eye incident. At that time, she earned $8 per hour and worked full-time. In the years following her departure from Lancaster General, Claimant's eye became infected several more times. Each time, her symptoms subsided with treatment, and Claimant did not miss any work with her other employers due to her eye infections. In October 2006, however, while Claimant was working for the Heart Group, Claimant's eye again became infected and, this time, her infection did not respond to treatment. By February 2007, Claimant lost the vision in her left eye, and, in May 2007, she underwent a cornea transplant. Sadly, the transplant did not improve her vision, and, as a result of her blindness, she was not able to return to work. At that time, Claimant earned $21 per hour working for the Heart Group on a part-time basis.

In March 2007, Claimant sent Lancaster General a letter detailing her employment history there, the 1979 incident with the tracheotomy patient, her history of eye infections, and her recent blindness. Ultimately, following the unsuccessful cornea transplant and remaining unable to return to work, Claim-

2. There is a discrepancy in the record concerning the exact date of the incident. That discrepancy has no bearing on our ultimate resolution of the question before us. For ease of reference, we hereinafter refer to that incident as "the 1979 incident."

ant filed a workers' compensation petition claiming the loss of use of her left eye, as of March 8, 2007,[3] due to contracting HSV while working for Lancaster General. Lancaster General denied the allegations. Before Workers' Compensation Judge Robert Benischeck ("WCJ"), Claimant presented the testimony of Dr. Barton Halpern, who testified that he began treating Claimant in 1985 and that Claimant sustained a dense vascularized corneal scar related to chronic inflammation from her contraction of HSV. Dr. Halpern testified that there was nothing wrong with Claimant's corneal transplant, but that the infection can affect other tissues in the eye beyond the cornea, which can lead to blindness, and that her injury was the result of this HSV infection. Lancaster General presented the testimony of Dr. Kristen Hammersmith, who agreed with much of Dr. Halpern's testimony, but believed it was merely possible, but not likely, that the incident with the tracheotomy patient was the actual source of Claimant's infections. Dr. Hammersmith testified that Claimant's report of poor vision following the incident, absent any redness or vesicles in the skin, was more typical of a secondary infection rather than an initial exposure to HSV.

The WCJ credited the testimony offered by Claimant and granted her specific loss claim petition. The WCJ determined Claimant suffered a work-related injury on May 16, 2007, the date on which her doctor informed her of her likely permanent blindness and of her inability to return to work. The WCJ also found her work-related injury stemmed from the incident with the tracheotomy patient, as that incident led to her contracting HSV, which, in turn, caused her blindness almost 30 years later. The WCJ noted Claimant's pay was determined by the hour, and, applying Section 309 of the Act, which we discuss in detail *infra*, the WCJ calculated Claimant's benefits as $389.50 per week for 275 weeks, a sum calculated based on Claimant's 2007 wages with the Heart Group.[4]

3. Claimant alleged the date of her injury as March 8, 2007 because that was roughly the time she began to experience blindness.

4. Although the WCJ did not explicitly indicate which subsection of Section 309 he used to arrive at Claimant's benefits calculation, a

Lancaster General appealed to the Workers' Compensation Appeal Board ("WCAB"), which affirmed. The WCAB concluded Dr. Halpern's testimony supported the conclusion that Claimant's injury was due to the 1979 incident in which she contracted HSV while an employee of Lancaster General. Further, based on our decision in *J.G. Furniture Div./Burlington v. W.C.A.B. (Kneller)*, 595 Pa. 60, 938 A.2d 233 (2007), the WCAB determined the WCJ correctly calculated Claimant's average weekly wage by using her wages at the time of her injury, which, it agreed, was in May 2007. Therefore, concluding there was substantial evidence supporting the WCJ's decision, the WCAB affirmed.

Lancaster General appealed to the Commonwealth Court, which affirmed the WCAB. *Lancaster General Hospital v. W.C.A.B. (Weber–Brown)*, 987 A.2d 174 (Pa.Cmwlth.2009). The court rejected Lancaster General's argument that Section 309(d.1) of the Act governed the calculation of Claimant's average weekly wage and that Claimant's wages with Lancaster General, not the Heart Group, control, concluding that subsection did not provide the proper test. Instead, the court observed the Act defines wages in terms of a claimant's weekly pay *at the time of the injury. Id.* at 180. The court went on to note that, in specific loss cases, the date of the injury is the date when the claimant is informed by a doctor of the "loss of use of the member or faculty for 'all practical intents and purposes' and that the injury is job related in nature." *Id.* As support, the court relied heavily on its own decision in *J.G. Furniture Div./Burlington v. W.C.A.B. (Kneller)*, 862 A.2d 689 (Pa.Cmwlth.2005) (holding that, where the claimant suffered an initial injury to his finger, which later led to amputation, the claimant's average weekly wage should have been based on his wages earned at the time of the amputation because that was the date of his work-related

review of the record reveals that the WCJ's computation worksheet consisted of tabulations consistent with the formula contained in Section 309(d). Moreover, this coincides with the WCJ's finding that Claimant was paid by the hour, thus rendering subsections (a), (b), and (c) inapplicable, as those sections apply to employees paid by the week, month, and year, respectively.

injury) *aff'd*, 595 Pa. 60, 938 A.2d 233 (2007). Applying its decision in *J.G. Furniture* to the instant matter, the court concluded the WCJ correctly fixed Claimant's date of injury as May 16, 2007, and, thus, that date was the proper one on which to base the calculation of Claimant's average weekly wage for workers' compensation purposes. *Weber–Brown*, 987 A.2d at 180–81.

 Lancaster General thereafter filed a petition for allowance of appeal with our Court, which we granted in order to address whether Section 309 of the Act permits a claimant's average weekly wage to be calculated based on wages earned with an employer different from the one paying benefits where the claimant suffered an initial incident, changed employers, and later suffered a work-related injury caused by the initial incident.[5]

Turning to the arguments of the parties, we initially note that Lancaster General neither contests that it is responsible to pay Claimant's benefits, nor challenges Claimant's date of injury as May 16, 2007. Rather, Lancaster General contests the calculation of the amount of Claimant's benefits under Section 309, which it contends should be based on her 1985 wages, earned with Lancaster General, and not her 2007 wages, earned with the Heart Group.

To better understand and evaluate the arguments of the parties, we first find it necessary to fully set forth Section 309 and its operation. Section 306 of the Act provides that an employee who suffers a specific loss injury will receive, as workers' compensation benefits, 66–2/3% of the employee's "wages" during a specified period. 77 P.S. § 513. The term "wages" is defined in Section 309, which provides various formulas for calculating the average weekly wage based on how the claimant's wages are fixed, as follows:

5. Our review of workers' compensation matters is limited to determining whether a constitutional violation, an error of law, or a violation of the Board's procedure has occurred, and whether the findings of fact are supported by substantial evidence. *Borough of Heidelberg v. W.C.A.B. (Selva)*, 593 Pa. 174, 178, 928 A.2d 1006, 1009 (2007).

Wherever in this article the term "wages" is used, it shall be construed to mean the average weekly wages of the employe, ascertained as follows:

(a) If at the time of the injury the wages are fixed by the week, the amount so fixed shall be the average weekly wage;

(b) If at the time of the injury the wages are fixed by the month, the average weekly wage shall be the monthly wage so fixed multiplied by twelve and divided by fifty-two;

(c) If at the time of the injury the wages are fixed by the year, the average weekly wage shall be the yearly wage so fixed divided by fifty-two;

(d) If at the time of the injury the wages are fixed by any manner not enumerated in clause (a), (b) or (c), the average weekly wage shall be calculated by dividing by thirteen the total wages earned in the employ of the employer in each of the highest three of the last four consecutive periods of thirteen calendar weeks in the fifty-two weeks immediately preceding the injury and by averaging the total amounts earned during these three periods.

(d.1) If the employe has not been employed by the employer for at least three consecutive periods of thirteen calendar weeks in the fifty-two weeks immediately preceding the injury, the average weekly wage shall be calculated by dividing by thirteen the total wages earned in the employ of the employer for any completed period of thirteen calendar weeks immediately preceding the injury and by averaging the total amounts earned during such periods.

(d.2) If the employe has worked less than a complete period of thirteen calendar weeks and does not have fixed weekly wages, the average weekly wage shall be the hourly wage rate multiplied by the number of hours the employe was expected to work per week under the terms of employment.

(e) Except as provided in clause (d.1) or (d.2), in occupations which are exclusively seasonal and therefore cannot be carried on throughout the year, the average weekly wage shall be taken to be one-fiftieth of the total wages which the

employe has earned from all occupations during the twelve calendar months immediately preceding the injury, unless it be shown that during such year, by reason of exceptional causes, such method of computation does not ascertain fairly the earnings of the employe, in which case the period for calculation shall be extended so far as to give a basis for the fair ascertainment of his average weekly earnings.

The terms "average weekly wage" and "total wages," as used in this section, shall include board and lodging received from the employer, and gratuities reported to the United States Internal Revenue Service by or for the employe for Federal income tax purposes, but such terms shall not include amounts deducted by the employer under the contract of hiring for labor furnished or paid for by the employer and necessary for the performance of such contract by the employe, nor shall such terms include deductions from wages due the employer for rent and supplies necessary for the employe's use in the performance of his labor, nor shall such terms include fringe benefits, including, but not limited to, employer payments for or contributions to a retirement, pension, health and welfare, life insurance, social security or any other plan for the benefit of the employe or his dependents: Provided, however, That the amount of any bonus, incentive or vacation payment earned on an annual basis shall be excluded from the calculations under clauses (a) through (d.2). Such payments if any shall instead be divided by fifty-two and the amount shall be added to the average weekly wage otherwise calculated under clauses (a) through (d.2).

Where the employe is working under concurrent contracts with two or more employers, his wages from all such employers shall be considered as if earned from the employer liable for compensation.

77 P.S. § 582.

In general terms, Section 309 calculates a claimant's average weekly wage by first examining how that claimant earned his or her wages "at the time of the injury." If at that time the claimant earned wages by the week, subsection (a) would

apply; if by the month, subsection (b) would be applicable; and if by the year, subsection (c) would apply. If a claimant is paid by the hour (or perhaps in some other manner not included within subsections (a), (b), or (c)), subsections (d), (d.1), and (d.2) become relevant. Subsection (d) applies where an hourly-wage claimant has worked for at least three consecutive 13–week periods "in the employ of the employer" in the 52 weeks "immediately preceding the injury." Stated differently, subsection (d) applies if, starting from the date of injury and looking back one year, the claimant was in "the employ of the employer" for at least three consecutive 13–week periods. If the claimant has not completed three consecutive 13–week periods of employment "in the employ of the employer" during this 52–week look-back period, then subsection (d.1) applies, which directs the claimant's average weekly wage be calculated by dividing by 13 the total wages earned "in the employ of the employer" in any completed 13–week period "immediately preceding the injury," and averaging those amounts. Subsection (d.2) then applies if subsection (d.1) cannot be met, and subsection (e) applies to seasonal employees. The application of subsection (d.1) and its connection to subsection (d), and those subsections' references to "employer" and "immediately preceding the injury," are at the heart of the instant matter, and are discussed in greater detail *infra*.

Recognizing that Claimant, as an hourly employee, does not fall within subsection (a), (b), or (c) of Section 309, Lancaster General argues Claimant's average weekly wage should be calculated pursuant to the hourly wage default provisions in subsection (d), (d.1), or (d.2)—specifically subsection (d.1). Lancaster General submits the phrases "by the employer" and "in the employ of the employer" in subsection (d.1) plainly refer to the employer who would pay workers' compensation benefits (the "payor"). Based on this premise, Lancaster General contends Section 309(d.1) applies when a claimant suffers a work-related injury, but, in the 52 weeks before the injury, has not completed three consecutive 13–week periods of employment with the payor. Lancaster General posits the claimant's average weekly wage is then calculated by dividing

by 13 the total wages earned in the 13–week period of employment with the payor nearest to the date of the work-related injury. As such, Lancaster General submits the plain meaning of the term "immediately" in Section 309(d.1) directs courts to use the 13–week period of employment with the payor nearest to the date of the injury, no matter the length of time between the actual injury and the completed 13–week period of employment. In other words, Lancaster General submits "immediate" means "most recent," and that the "employer" means the payor.

Applying this interpretation to Claimant's case, Lancaster General points out that Claimant was not employed by Lancaster General for at least three consecutive 13–week periods in the 52 weeks prior to her injury in May 2007. Therefore, Lancaster General avers, Section 309(d.1) is directly applicable. As such, Lancaster General submits Claimant's average weekly wage should be calculated using her most recently completed 13–week period of employment with Lancaster General prior to her injury, which occurred in 1985 when Claimant was earning $8.00 per hour. Thus, Lancaster General contends Claimant's wages earned during her final 13–weeks of employment with Lancaster General in 1985, rather than her 2007 wages with the Heart Group, should be used to calculate her average weekly wage.

Lancaster General challenges the Commonwealth Court's pronouncement that the Act generally defines wages in terms of a claimant's weekly pay at the time of injury, noting that nowhere does the Act contain such a general definition. Rather, Lancaster General argues, Section 309 does define a claimant's average weekly wage as the claimant's weekly pay, but only when the claimant's wages are fixed by the week. It maintains that Claimant's wages have always been fixed by the hour, a situation that is governed by Section 309(d), (d.1), and (d.2).

Additionally, Lancaster General contends our decision in *J.G. Furniture* does not support using wages earned from an employer different than the one paying benefits because, although the claimant in *J.G. Furniture* suffered an initial

incident that later led to a work-related injury, the claimant worked for the same employer during that time. In fact, Lancaster General posits the Act has never been interpreted to authorize workers' compensation benefits based on wages earned with an employer other than the payor. Further, Lancaster General contends, if *J.G. Furniture* were extended to encompass the instant situation and allow calculation of a claimant's average weekly wage based on wages earned with a different employer, it would handicap employers in their defenses, particularly where, as here, there was a large gap in time between the initial incident and the onset of the injury. Indeed, Lancaster General claims it was subjected to adverse factual findings because its records regarding the 1979 incident were incomplete due to the lapse of time.

Finally, Lancaster General submits equitable factors weigh in its favor. Specifically, Lancaster General claims calculating a claimant's average weekly wage based on her employment with an unaffiliated, subsequent employer could lead to absurd results, particularly where the claimant acquired additional education, changed careers, or realized a sizable increase in income. It would be difficult, Lancaster General alleges, for an employer or insurer to predict its workers' compensation liability if it were required to consider the possible average weekly wages of all former employees, no matter their current salary or career. As a corollary, Lancaster General contends using the last wages earned with the payor for purposes of calculating a claimant's average weekly wage does not necessarily work an injustice against a claimant, as sometimes those wages will be higher than a claimant's current salary, and, in any event, such a method provides predictability in the calculation for both employers and claimants.

In response, Claimant argues that Section 309(a) of the Act is applicable in calculating her average weekly wage. She notes that section provides, "if at the time of the injury the wages are fixed by the week, the amount so fixed shall be the average weekly wage." Brief of Appellee at 3 (citing 77 P.S. § 582(a)). Claimant alleges her wages were fixed by the week

at the time of her injury.[6] Further, Claimant relies on this Court's opinion in *J.G. Furniture* for the proposition that wages are to be fixed at the time of injury, which, Claimant contends, in her case, was properly determined to be May 16, 2007. Claimant submits that nowhere does Section 309 require the average weekly wage be calculated based on earnings with the payor.

Claimant also argues Section 309(d.1) is inapplicable in this case because, in providing a formula for calculating a claimant's average weekly wage, it considers the 13–week period "immediately preceding the injury." Claimant asserts Lancaster General would have this Court interpret "immediately" to cover a 20–plus–year gap, which, Claimant contends, is contrary to the plain meaning of that term. Further, Claimant notes the Act is to be construed in favor of the employee in order to achieve its humanitarian objectives, and, to that end, fixing her average weekly wage in 2007 more accurately reflects her actual economic loss. Finally, Claimant avers Section 309(e) of the Act allows "exceptional causes" to be considered when an average weekly wage computation does not fairly ascertain the wages actually earned by the injured employee. Claimant submits her injury is truly exceptional, in that she did not suffer her work-related injury until roughly 27 years after the initial incident. As such, Claimant requests that we affirm the lower courts and award her workers' compensation benefits based on her 2007 wages.

 This case requires us to interpret Section 309 of the Act. As in all matters of statutory construction, we must ascertain and effectuate the intent of the General Assembly. *See* 1 Pa.C.S.A. § 1921(a). The best indication of the General Assembly's intent in enacting a certain statute is generally found in its plain language. *Martin v. Commonwealth, Dep't of Transp., Bureau of Driver Licensing*, 588 Pa. 429, 438, 905 A.2d 438, 443 (2006). In addition, we presume the General Assembly did not intend a result that is absurd or unreasonable. 1 Pa.C.S.A. § 1922(1). Of particular relevance to this

6. Despite Claimant's assertion in this regard, the WCJ concluded, and the record reveals, that her wages with both Lancaster General and the Heart Group were fixed by the hour.

case, we are mindful that the Act was intended to benefit the injured employee, and, therefore, must be construed liberally in the employee's favor in order to effectuate the Act's humanitarian objectives. *City of Philadelphia v. W.C.A.B. (Williams)*, 578 Pa. 207, 215, 851 A.2d 838, 843 (2004). As such, borderline interpretations are to be decided in favor of the claimant. *Id.* at 216, 851 A.2d at 843.

With these principles in mind, we turn to our construction of the Act. What is readily apparent from the various subsections of Section 309, quoted at length and discussed in broad terms above, is their varied application to disparate employment circumstances. Indeed, in *Hannaberry HVAC v. W.C.A.B. (Snyder)*, 575 Pa. 66, 834 A.2d 524 (2003), we observed that subsections (a), (b), and (c) provide fairly straightforward methods for calculating the average weekly wage of employees whose wages are fixed by the week, month, or year, respectively; while subsections (d) and (d.1) address those employees who earned their wages by the hour. *Id.* at 80, 834 A.2d at 532. Further, we observed that subsection (d.2) applies to recently hired employees, as it permits wage projection based on the number of hours the employee was expected to work had he or she not been injured. *Id.* Finally, we noted that subsection (e) allows for some flexibility in calculating those wages earned by seasonal employees in order to arrive at a "fair ascertainment" of the claimant's weekly wage. *Id.*

Herein, the WCJ found that Claimant's wages were fixed by the hour and calculated her average weekly wage pursuant to the formula contained in subsection (d), as Claimant worked three consecutive 13–week periods with the Heart Group prior to her injury. Lancaster General, contending the term "employer" in subsections (d) and (d.1) refers to it, not the Heart Group, argues, however, that subsection (d.1) is applicable to Claimant because she did not complete three consecutive 13–week periods of employment *with Lancaster General* prior to her injury. Accordingly, our primary focus concerns to which "employer" Section 309 refers.

Despite Lancaster General's focus on subsection (d.1), we note that every subsection of Section 309 references an "inju-

ry" and an "employer," either implicitly or explicitly. Further, Section 309 does not indicate, nor do the parties suggest, that the various subsections of Section 309, although addressed to different employment scenarios, refer to different injuries, or to different employers. Accordingly, although our attention in the instant case is focused on subsection (d.1), the remaining subsections of Section 309 are nonetheless relevant to our analysis because Section 309 addresses the same "injury" and "employer" throughout its subsections. Indeed, we recognized in *Hannaberry HVAC* that Section 309 was not intended to fundamentally treat the various types of employees differently. Rather, the differing calculations served the common goal of accurately measuring an injured employee's wages, regardless of how that employee earned those wages. *Hannaberry HVAC*, 575 Pa. at 80, 834 A.2d at 532.

The fact that Section 309's various employment scenarios all involve an "employer" does not resolve the present dispute, however, as in asserting that subsection (d.1) is applicable to Claimant, Lancaster General's contention becomes whether the term "employer" in Section 309 means the employer at the time of injury, or the payor. For purposes of the Act, Section 103, 77 P.S. § 21, defines "employer" as "synonymous with master, and to include natural persons, partnerships, joint-stock companies, corporations for profit, corporations not for profit, municipal corporations, the Commonwealth, and all governmental agencies created by it." This definition is of little help in resolving the matter *sub judice*, however, as it does not indicate whether "employer" under Section 309 refers to the payor or the employer at the time of the injury—that is, in this case, both Lancaster General and the Heart Group fit the definition of employer.

Yet, the term "employer" is used in other sections throughout the Act, including, *inter alia*, Section 301(a) and Section 306(e).[7] Section 301(a) provides that the "employer" shall be liable for compensation for personal injury to, or the death of, an employee caused by an injury sustained in the course of

7. 77 P.S. §§ 431 and 531, respectively.

employment. Similarly, Section 306(e) establishes that the "employer" is liable for surgical and medical expenses associated with the work-related injury. Obviously, in using the term "employer," these sections each refer to the payor, as they discuss the employer as the entity or person responsible for paying benefits and medical expenses. While it would be superficially appealing to thus conclude the term "employer," as it is used in Section 309, should likewise refer to the payor, a closer analysis reveals that Section 309 involves a different focus than Sections 301(a) and 306(e). More specifically, Section 301(a) establishes when the payor becomes liable for workers' compensation benefits, and Section 306(e) outlines the expenses for which the payor is responsible. Neither section, however, concerns the calculation of those liabilities. In contrast, Section 309 is concerned with calculating the claimant's average weekly wage "at the time of the injury," which, as this case suggests, could be long after the incident which established the payor's liability. For this reason, the meaning of "employer" in Sections 301(a) and 306(e) does not necessarily control the question of which employer is relevant for purposes of calculating the average weekly wage. Moreover, Section 309 itself does not explicitly indicate which "employer"—the payor or the employer at the time of the injury—is relevant for purposes of its calculation. As the language of the Act is not explicit regarding the present question under Section 309, we turn to principles of statutory construction. See 1 Pa.C.S.A. § 1921(c).[8]

██ Considering those principles here, we conclude the most logical interpretation of "employer" in Section 309 is that it means the employer at the time of the work-related injury. First, the express language of the subsections of Section 309 directs attention to the time of the injury, as subsections (a), (b), (c), and (d) begin explicitly with the language, "if at the time of the injury, the wages are fixed by ...," thereby signaling that the time of the injury is the relevant time period for purposes of examining how the injured employee earned

8. In particular, we find factors (1) ("the occasion and necessity for the statute"), (4) ("the object to be attained"), and (6) ("the consequences of a particular interpretation") to be instructive herein.

his or her wages. Notably, this language also refers to the manner in which wages "are fixed," attaching a present tense meaning (relative to the injury) to the term "wages," and thus appearing to exclude consideration of wages earned by a prior employer. Moreover, subsections (d), (d.1), and (e), in establishing their respective formulas, consider periods of time "immediately preceding the injury," again focusing on the period of time nearest to the date of the work-related injury. Furthermore, interpreting "employer" to mean the employer at the time of the injury is consistent with the goal of providing a claimant specific loss benefits calculated using an accurate representation of the claimant's actual lost wages as of the date of the injury. *See Hannaberry HVAC*, 575 Pa. at 81–82, 834 A.2d at 533 (concluding the goal in enacting the current version of Section 309(d) was to provide a more accurate representation of an injured employee's lost wages, and to eliminate the mischief of an injured employee's relying on artificially high periods of earnings to receive inflated workers' compensation benefits). Otherwise, interpreting "employer" to mean the employer at the time of the initial incident would result in a claimant receiving specific loss benefits calculated using out-of-date wages merely because the claimant's injury happened to lie dormant for a period of time. Indeed, here, were we to interpret "employer" to mean the employer at the time of the initial incident, Claimant would receive specific loss benefits calculated using wages she earned over 20 years ago.

*J.G. Furniture* supports a conclusion that a claimant's average weekly wage should be based on his wages earned at the time of his work-related injury, rather than at the time of an earlier incident which ultimately caused his injury. Therein, an initial incident occurred in 1976 injuring the claimant's finger. The claimant received temporary disability benefits until 1978, at which time he returned to work. In 1984, however, the claimant required amputation of his finger due to circulatory problems stemming from the initial incident in 1976. *J.G. Furniture*, 595 Pa. at 62–63, 938 A.2d at 235. We concluded the claimant's amputation was not a recurrence or aggravation of his prior injury, despite the fact that his 1976

incident led to the later amputation. Instead, we held the claimant's amputation constituted a separate, specific loss injury. As a result, centered on the language of Section 309, we held the claimant's average weekly wage should have been calculated based on his wages at the time of the amputation in 1984. *Id.* at 68, 938 A.2d at 238.

Lancaster General submits "employer" in subsection (d.1) refers to the payor, and submits the phrase "immediately preceding the injury" means the injured employee's most recent period of employment *with the payor.* Admittedly, in the usual workers' compensation case, the payor is also the employer at the time of the injury. In a situation such as this one, where the payor is not the employer at the time of the injury, due to a gap in time between the triggering incident and the work-related injury, Lancaster General's interpretation would have us calculate Claimant's benefits based on her wages earned with the previous employer. Indeed, here, Lancaster General suggests we base the award on Claimant's wages earned more than two decades before her injury. We cannot accept this interpretation.

First, Lancaster General's assertion is at odds with the overall goal of Section 309: to provide an accurate representation of an injured employee's actual, current lost wages. Second, its assertion is inconsistent with *J.G. Furniture,* which focuses the calculation on the claimant's wages as of the date of the injury. Third, Lancaster General's interpretation is counter to our observation in *Hannaberry HVAC* that Section 309 fundamentally aims to treat each category of employee addressed in Section 309 the same. More specifically, Lancaster General's reading of Section 309(d.1) would require the use of past wages for an hourly employee's calculation in a situation such as this, while a different employee who suffers the same delayed injury, but is paid by the week, month, or year, would have her average weekly wage calculated by the use of current wages under subsection (a), (b), or (c).

Finally, to the extent Lancaster General claims it is unfair to require it to pay workers' compensation benefits based on

wages earned with an unrelated, and perhaps higher paying, employer, the final sentence of Section 309 is instructive. That sentence provides, where a claimant worked for two or more employers at the time of injury, "his wages from all such employers shall be considered as if earned from the employer liable for compensation." 77 P.S. § 582. This provision makes clear that Section 309 is more concerned with providing full compensation to claimants, rather than ultimate equity to employers, as it counts wages earned with employers other than the payor in the average weekly wage calculation.

Therefore, in light of the foregoing, we hold the term "employer" as used in Section 309 must be construed to mean the employer at the time of the injury.[9] Accordingly, we find the Commonwealth Court correctly held, as did the WCJ and the WCAB below, that Claimant's average weekly wage should be based on her 2007 wages with the Heart Group, as those wages were earned with Claimant's employer at the time Claimant suffered her work-related injury. Therefore, we affirm the decision of the Commonwealth Court.

Jurisdiction relinquished.

Justice ORIE MELVIN did not participate in the decision of this case.

Chief Justice CASTILLE and Justices SAYLOR, BAER and McCAFFERY join the opinion.

Justice EAKIN files a concurring opinion in which Justice BAER joins.

Justice EAKIN, concurring.

I agree that under the statute, claimant's benefits must be based on wages earned at the time the injury manifested, rather than wages at the time of the incident which led to that manifestation. The loss of claimant's vision is compensable at the rate paid "immediately preceding the injury"; here, that is 2007. However, for purposes of which employer must pay the

9. Given our interpretation, we need not address Claimant's reliance on the "exceptional causes" language in Section 309(e).

benefits, the injury was in 1979, 28 years before it happened for purposes of setting the rate. This incongruity is not before us, as Lancaster General neither contests responsibility for claimant's benefits, nor challenges the date of the injury.

While the claimant benefits here from our result, it is because her wage increased between the "incident" and the injury manifesting itself. The precedent of this case may easily work to the detriment of the next claimant whose wages *decreased* between incident and manifestation. Sometimes the desire to effectuate the humanitarian purposes of the Act, interpreting ambiguous language with an eye toward charitable results, can lead to a rule with non-charitable results in the next case.

Thus, this case reveals a gap in the legislative scheme in which an appropriate response should come from the legislature, not this Court. This case points out several incongruities arising from situations not clearly contemplated when crafting the statute, which should be dealt with comprehensively by our legislature, not piecemeal by the courts.

Justice BAER joins this concurring opinion.