**[J-28-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | |
|---|---|
| BRAD LEE HEROLD, AS EXECUTOR OF THE ESTATE OF WILLIAM L. HEROLD | : No. 22 WAP 2023 |
| | : |
| | : Appeal from the Order of the |
| | : Commonwealth Court entered |
| v. | : February 16, 2023, at No. 998 CD |
| | : 2021, affirming the Order of the |
| | : Court of Common Pleas of |
| UNIVERSITY OF PITTSBURGH - OF THE | : Allegheny County entered May 17, |
| COMMONWEALTH SYSTEM OF HIGHER | : 2021, at No. GD-19-014532 and |
| EDUCATION AND 3M COMPANY; ABB | : remanding. |
| MOTORS AND MECHANICAL, INC. F/K/A | : |
| BALDOR ELECTRIC COMPANY; ALLIED | : ARGUED: April 10, 2024 |
| GLOVE CORPORATION; A.O. SMITH | : |
| CORPORATION; ARMSTRONG | : |
| INTERNATIONAL, INC.; AURORA PUMP | : |
| COMPANY; BALTIMORE AIRCOIL | : |
| COMPANY, INC.; BEAZER EAST, INC. | : |
| INDIVIDUALLY AND AS SUCCESSOR TO | : |
| KOPPERS COMPANY, INC., AND | : |
| SUCCESSOR-IN INTEREST TO THIEM | : |
| CORPORATION AND UNIVERSAL | : |
| REFRACTORIES COMPANY; BMI | : |
| REFRACTOR SERVICES, INC.; | : |
| INDIVIDUALLY AND AS SUCCESSOR-IN- | : |
| INTEREST TO PREMIER REFRACTORIES, | : |
| INC., F/K/A ADIENCE, INC., SUCCESSOR- | : |
| IN-INTEREST TO ADIENCE COMPANY, | : |
| LP, AS SUCCESSOR TO BMI, INC.; | : |
| BURNHAM BOILER CORPORATION | : |
| N/D/B/A BURNHAM COMMERCIAL; | : |
| BRYAN STEAM, LLC; CARRIER | : |
| CORPORATION; CBS CORPORATION, A | : |
| DELAWARE CORPORATION, F/K/A | : |
| VIACOM INC., SUCCESSOR BY MERGER | : |
| TO CBS CORPORATION, A | : |
| PENNSYLVANIA CORPORATION, F/K/A | : |
| WESTINGHOUSE ELECTRIC | : |
| CORPORATION AND WESTINGHOUSE | : |
| AIR BRAKE COMPANY; CLEAVER | : |

BROOKS, INC., F/K/A AQUA-CHEM, INC. :
D/B/A CLEAVER BROOKS DIVISION; :
CRANE CO.; DELVAL EQUIPMENT :
CORPORATION; DEZURIK, INC.; DONALD :
MCKAY SMITH, INC.; DUNHAM-BUSH, :
INC.; E.E. ZIMMERMAN COMPANY; :
EATON CORPORATION IN ITS OWN :
RIGHT AND AS SUCCESSOR TO :
CUTLER-HAMMER,INCORPORATED; :
EICHLEAY CORPORATION; FERRO :
ENGINEERING DIVISION OF ON MARINE :
SERVICES COMPANY, LLC, F/K/A :
OGLEBAY NORTON :
COMPANY;FLOWSERVE US, INC., :
INDIVIDUALLY AND AS SUCCESSOR TO :
BYRON JACKSON PUMPS, :
FLOWSERVEGESTRA, DURAMETALLIC :
CORP., ALDRICH PUMPS; CAMERON :
PUMPS; VOGT VALVES;WILSON-SNYDER :
CENTRIFUGAL PUMP; AND ROCKWELL :
VALVES; FMC CORPORATION, :
INDIVIDUALLY AND AS SUCCESSOR-IN- :
INTEREST TO PEERLESS PUMP :
COMPANY, CHICAGO PUMP COMPANY, :
STERLING FLUID SYSTEM, INC. AND :
FORMER SUBSIDIARY CROSBY VALVE, :
INC.; FOSECO, INC.; FOSTER WHEELER :
CORPORATION; GARDNER DENVER, :
INC.; GENERAL ELECTRIC COMPANY; :
GRINNELL LLC; GOULDS PUMPS, LLC; :
I.U. NORTH AMERICA, INC.; AMERICA, :
INC. AS SUCCESSOR-BY-MERGER TO :
THE GARP COMPANY, F/K/A THE GAGE :
COMPANY, F/K/A PITTSBURGH GAGE :
AND SUPPLY COMPANY; IMO :
INDUSTRIES, INC., F/K/A IMO DELAVAL, :
INC., F/K/A TRANSAMERICAN DELAVAL, :
INC., F/K/A DELAVAL TURBIN, INC., :
DELAVAL TURBIN, INC., DEVALCO :
CORPORATION; INGERSOLL-RAND :
COMPANY; INSUL COMPANY, INC.; ITT :
CORPORATION, F/K/A ITT INDUSTRIES, :
INDIVIDUALLY AND AS SUCCESSOR-IN- :
INTEREST TO BELL & GOSSETT :
DOMESTIC PUMP; J.H. FRANCE :
REFRACTORIES COMPANY; KRUMAN :

EQUIPMENT COMPANY; MALLINCKRODT US LLC, IN ITS OWN RIGHT AND AS SUCCESSOR-IN-INTEREST TO IMCERA GROUP, INC., AND INTERNATIONAL GROUP, INC., AND INTERNATIONAL MINERALS AND CHEMICAL CORPORATION, AND AS SUCCESSOR-IN-INTEREST TO E.J. LAVINO; MINE SAFETY APPLIANCES COMPANY, LLC AS SUCCESSOR-IN-INTEREST BY MERGER WITH MINE SAFETY APPLIANCES COMPANY; MINNOTTE CONTRACTING CORPORATION; M.S. JACOBS & ASSOCIATES, INC.; NAGLE PUMPS, INC.; PEERLESS INDUSTRIES, INC.; POWER PIPING COMPANY; RILEY POWER INC.; SAFETY FIRST INDUSTRIES, INC., IN ITS OWN RIGHT AND AS SUCCESSOR-IN-INTEREST TO SAFETY-FIRST SUPPLY, INC.; SCHNEIDER ELECTRIC USA, INC. F/K/A SQUARE D COMPANY, IN ITS OWN RIGHT AND AS SUCCESSOR TO THE ELECTRIC CONTROLLER AND MANUFACTURING (EC&M); SPIRAX SARCO, INC.; SPX COOLING TECHNOLOGIES, INC., F/K/A MARLEY COOLING TECHNOLOGIES INC., F/K/A THE MARLEY COOLING COMPANY; TACO, INC. F/K/A TACO HEATERS, INC.; THE GOODYEAR TIRE & RUBBER COMPANY; THE GORDON-RUPP COMPANY; THE H.B. SMITH COMPANY, INC.; TRANE U.S. INC., SUCCESSOR-BY-MERGER TO AMERICAN STANDARD, INC., UNION CARBIDE CORPORATION; UNITED STATES STEEL CORPORATION; WARREN PUMPS LLC; WEIL-MCLAIN COMPANY, INC.; YORK INTERNATIONAL CORPORATION; AND ZURN INDUSTRIES, LLC F/K/A ZURN INDUSTRIES, INC. A/K/A ERIE CITY IRON WORKS

APPEAL OF: UNIVERSITY OF PITTSBURGH - OF THE

COMMONWEALTH SYSTEM OF HIGHER
EDUCATION

## OPINION

**CHIEF JUSTICE TODD**                    **DECIDED: JANUARY 22, 2025**

In this appeal by allowance, we consider, *inter alia*, the breadth of the exclusive remedy provision of the Occupational Disease Act ("ODA")[1] and whether a disability or death resulting from an occupational disease and which occurs beyond the four-year limitations period set forth in Section 1401(c) of the ODA, 77 P.S. § 1401(c), removes the claim from the purview of the ODA's exclusivity clause, 77 P.S. § 1403. For the reasons that follow, and giving fidelity to the "Grand Bargain" underlying our Commonwealth's laws providing compensation to injured workers, we hold that a common law action for relief for a disability or death resulting from an occupational disease covered by the ODA — and which occurs beyond the four-year limitations period contained in the ODA, rendering such disability or death non-compensable — does not fall within the purview of the ODA's exclusivity provision. Therefore, we find that the exclusivity provision does not preclude an injured worker from filing a common law action against his employer seeking compensation for his work-related disability or death. Accordingly, we affirm the decision of the Commonwealth Court.

---

[1] Act of June 21, 1939, P.L. 566, *as amended*, 77 P.S. §§ 1201-1603. The ODA, as well as the Workers' Compensation Act ("WCA"), Act of June 2, 1915, P.L. 735, 77 P.S. §§ 1-1041.1-2626, provide section numbers that are the official citation to the applicable section of the ODA. These section numbers are distinct from, but correspond to, the sections provided in Purdon's Pennsylvania Statutes, which is an unofficial codification of Pennsylvania law. For example, Section 303 of the ODA is a citation to the Act, whereas 77 P.S. § 1403 is the citation to the same section in Purdon's Pennsylvania Statutes. For clarity, we will refer to provisions of the ODA and WCA only by their Purdon's citation.

William Herold ("Herold")[2] worked for Appellant, the University of Pittsburgh ("University"), as a stationary engineer for approximately 40 years — from 1976 until 2004 — during which time he was exposed to asbestos. In 2004, Herold became a foreman, a position in which he was no longer exposed to asbestos. He retired from his employment with the University in 2015. In April 2019, approximately 15 years after his last exposure to asbestos, Herold was diagnosed with mesothelioma, a cancer in the lining of the lung.[3] Expert evidence attributed the cause of Herold's mesothelioma to his asbestos exposures. Herold died on April 30, 2022, due to this cancer. His death was approximately 18 years after his last date of exposure to asbestos, and 7 years after his last date of employment with the University.

In October 2019, Herold commenced a common law negligence action against, *inter alia*, the University in the Allegheny County Court of Common Pleas to recover damages arising from his exposure to asbestos and subsequent development of mesothelioma. In January 2021, the University sought summary judgment contending that the trial court lacked subject matter jurisdiction over Herold's claim, as he suffered from mesothelioma, which the University asserted was an occupational disease under the ODA and subject to its "exclusivity provision." 77 P.S. § 1403. Section 1403 of the

---

[2] Appellee is Brad Lee Herold, who is acting as executor of the estate of William Herold. We will refer to William as "Herold" and Brad as "Executor."

[3] Mesothelioma is a cancer causally linked to asbestos exposure in the pleural cavity upon which non-malignant lesions develop and then become malignant. The tumor grows and pushes the lung aside adversely affecting respiratory function. Mesothelioma has a lengthy latency period. *J.H. France Refractories Co. v. Allstate Insurance Company*, 578 A.2d 468, 474 (Pa. Super. 1990), *affirmed in part and reversed in part*, 626 A.2d 502 (Pa. 1993). We have long recognized that the estimated latency period for asbestosis and most lung cancers is 10 to 20 years, whereas the latency period for mesothelioma is 30 to 50 years. *See Daley v. A.W. Chesterton*, 37 A.3d 1175, 1188 (Pa. 2012). Thus, even mesothelioma that manifests at the lower end of this average may not occur for decades following an employee's exposure to asbestos.

ODA is a provision which limits claims and compensation for an occupational disease to those provided under the ODA;[4] such claims are processed exclusively by the "Workmen's Compensation Board" ("Board"). *See* 77 P.S. §§ 1207, 1510 (providing that claims for compensation under the ODA are presented to the Board).

On May 17, 2021, the trial court denied the University's motion for summary judgment, finding that the ODA defines an occupational disease as one that occurs within four years of last exposure to the hazards of such disease, and that Herold's last exposure to asbestos occurred far longer than the four-year limitations period defined in the ODA. Based on this foundation, the trial court explained that the only section of the ODA that could potentially apply to Herold's claim was the "savings clause," which provides relief beyond the four-year period for specific employees who contract certain enumerated diseases. 77 P.S. § 1401(i); Trial Ct. Op., 11/24/21, at 2. However, the court opined that the savings clause applied only to "silicosis, anthraco-silicosis, coal worker's pneumoconiosis, and asbestosis." Trial Ct. Op., 11/24/21, at 2 (citing 77 P.S. § 1401(i)).

---

[4] This exclusivity provision provides that:

> Such agreement [referenced in Section 1402 between the employer and employee accepting provisions of Article III of the ODA] shall constitute an acceptance of all the provisions of article three of this act, and shall operate as a surrender by the parties thereto of their rights to any form or amount of compensation or damages for any disability or death resulting from occupational disease, or to any method of determination thereof, other than as provided in article three of this act. Such agreement shall bind the employer and his personal representatives, and the employe, his or her wife, or husband, widow or widower, next of kin, and other dependents.

77 P.S. § 1403 (footnote omitted). The "agreement" is "actually a conclusive presumption that both the employer and the employee have agreed to be bound by all of the provisions of the statute." *Barber v. Pittsburgh Corning Corp.*, 555 A.2d 766, 769 n.9 (Pa. 1989). To reject this "'elective compensation' [the parties] must carefully comply with the rejection procedures described in the Act in order to overcome the conclusive presumption of acceptance." *Id.*

According to the trial court, the savings clause was inapplicable, as Herold did not suffer from one of these enumerated occupational diseases. Therefore, the trial court concluded that, as the ODA did not apply to Herold, he did not need to pursue a claim before the Board before pursuing his civil claim, and, as a result, the court denied the University's motion for summary judgment. *Id.* at 3. After receiving permission to appeal the trial court's interlocutory order, the University argued before the Commonwealth Court that, *inter alia*, the ODA's exclusivity provision required Herold's claims to be adjudicated through the Board.

On appeal, a unanimous three-judge panel of the Commonwealth Court, in a published opinion authored by Judge Lori Dumas, affirmed and remanded for further proceedings. *Herold v. University of Pittsburgh*, 291 A.3d 489 (Pa. Cmwlth. 2023). As a preliminary matter, the court explained that the WCA and the ODA have together provided "a comprehensive, no-fault system of compensation for employees injured in the course of their employment." *Id.* at 496.[5] Noting that both acts contain similar exclusivity

[5] As our Court has explained, "'[t]he Workers' Compensation Act is remedial legislation designed to compensate claimants for earnings loss occasioned by work-related injuries'. . . . The statute seeks 'to provide recompense commensurate with the damage from accidental injury, as a fair exchange for relinquishing every other right of action against the employer.'" *City of Erie v. Workers' Compensation Appeal Board (Annunziata)*, 838 A.2d 598, 601 (Pa. 2003) (citations omitted). Similarly, the ODA, modeled after, and a supplement to, the WCA, *Staller v. Staller*, 21 A.2d 16, 17 (Pa. 1941), has a remedial and humanitarian purpose. *Bley v. Commonwealth, Department of Labor and Industry*, 399 A.2d 119, 122 (Pa. 1979). Notwithstanding the overlap in coverage for occupational disease, and the similarity of the two pieces of legislation, the two statutes remain separate and distinct. *See Pawlosky v. Workmen's Compensation Appeal Board. (Latrobe Brewing Co.)*, 525 A.2d 1204, 1210 n.9 (Pa. 1987) (observing that, despite similarities in coverage, the General Assembly has not repealed the ODA). In *Pawlosky*, we suggested that the ODA would eventually become obsolete: "Obviously, one of the main reasons for not repealing it was to make clear that the 1939 statute was to remain in force with respect to occupational diseases contracted prior to the effective date of the 1972 disease provisions of the Workmen's Compensation Act." *Id.* The number of employes who have contracted an occupational disease prior to 1972 will continue to (continued…)

provisions, the court observed that these provisions "reflect the historical *quid pro quo* between employers and employees," requiring employees who suffer from occupational disease to seek benefits for their diseases from the workers' compensation administrative process under the WCA or ODA. *Id.* Nevertheless, the court commented that "the statutory relief defined [in the WCA and the ODA] has not always fulfilled the promise that employees would secure a limited, though certain, recovery in exchange for the tort immunity accorded employers," highlighting the critical distinction between coverage and compensation under the acts. *Id.* at 497-98.

The court believed this distinction was most pronounced in the context of latent occupational diseases. In support thereof, the court pointed out that the latency period for mesothelioma can be as long as 50 years, but that the WCA limits compensation to occupational diseases manifesting within 300 weeks (*i.e.*, less than 6 years) from the last workplace exposure, and the ODA limits compensation to occupational diseases manifesting within 4 years of the last workplace exposure. Thus, the court opined that, "under either statutory regime, these limitations periods operate as a *de facto* exclusion of coverage for certain occupational diseases that are prone to latency." *Id.* at 498.

The Commonwealth Court noted that our Court addressed this paradox in the context of the WCA in *Tooey v. AK Steel Corp.*, 81 A.3d 851, 855 (Pa. 2013), discussed in greater depth *infra*. In *Tooey*, plaintiffs were diagnosed with mesothelioma 25 years after their last workplace exposure. The focus of the opinion was Section 411(2) of the WCA, which provided that "whenever occupational disease is the basis for compensation, for disability or death under **this act, it shall apply** only to disability or death resulting from such disease and occurring within three hundred weeks after the [last occupational

---

decline, and, while over 50 years have passed since the 1972 contraction date, the ODA has not been repealed.

exposure]." 77 P.S. § 411(2) (emphasis added). Our Court viewed "it" in the phrase "it shall apply" as referring to "this act," such that the act, that is, the WCA, "shall apply only to disability or death resulting from such disease and occurring within three hundred weeks after the [last occupational exposure.]" *Id.* Thus, as the limitations period in Section 411(2) of the WCA limited compensation to occupational injuries which manifested within 300 weeks of final exposure, the *Tooey* Court held that claims for latent occupational disease manifesting more than 300 weeks after final exposure were excluded from the WCA's exclusivity provision and could be brought in a civil action.

The Commonwealth Court then turned to the definition of "compensable disability or death" under Section 1401(c) of the ODA:

> Wherever compensable disability or death is mentioned as a cause for compensation under this act, ***it*** shall mean only compensable disability or death resulting from occupational disease and occurring within four years after the date of [claimant's] last employment in such occupation or industry.

77 P.S. § 1401(c) (emphasis added). Noting that the parties disputed the meaning of "it" in the statute, the court believed that the most reasonable interpretation of this statutory language — and consistent with our Court's approach in *Tooey* — was to construe "it" as referring to the immediately preceding noun, "act," such that Section 301(c) effectively read:

> Wherever ***compensable disability or death*** is mentioned as a cause for compensation under ***this act, [the act] shall mean*** only compensable disability or death resulting from occupational disease and occurring within four years after the date of his last employment in such occupation or industry.

*Id.* (emphasis added). Thus, based on its interpretation, the court declared that "[w]herever the ODA mentions compensable disability or death as a cause for compensation, the ODA means only compensable disability or death (1) resulting from

occupational disease and (2) manifesting within 4 years after the last workplace exposure." *Herold*, 291 A.3d at 502.[6]

However, the court emphasized that, unlike the language in Section 411(2) of the WCA (which we held in *Tooey* conveyed a jurisdictional limit), the operative language in Section 1401(c) of the ODA did not expressly remove from the ODA's purview claims involving a latent occupational disease which manifests beyond the limitation period. Rather, the ODA merely refined the definition of "compensable disability or death." Thus, the court explained that, while the ODA covered Herold's claim, it offered no compensation for his disability or death resulting from his work-related disease.

Nevertheless, the court declared that the ODA does not provide the *exclusive* remedy for Herold's claims. The court reasoned that the ODA's exclusivity provision in Section 1403 requires only that "an employee surrender two rights: (1) the right to compensation [outside of the workers' compensation system] for disability or death resulting from occupational disease and (2) the right to select a method of securing compensation for disability or death," *id.* at 504; 77 P.S. § 1403, but that this provision must be read in conjunction with the definition of "compensable disability or death" under Section 1401(c), which contains a temporal limitation on compensability. Thus, the court found that "the exclusive remedy mandate extends only to those claims asserting compensable disability or death resulting from occupational disease and manifesting within 4 years after the last workplace exposure." *Herold*, 291 A.3d at 504. Stated differently, "[a]bsent compensable disability or death as defined by the ODA, an injured employee has not surrendered the rights to pursue compensation in a manner of their

---

[6] The parties disagree regarding whether the date of last *employment* or the date of last *exposure* triggers Section 1403's limitations period. As discussed more fully in footnote 25, *infra*, we need not resolve this dispute in this appeal, but remand the issue for the trial court's resolution.

choosing." *Id.* As a result, the Commonwealth Court held that the exclusivity provision did not apply to Herold's claims, and that the Board did not have exclusive jurisdiction to adjudicate such claims.

Further, addressing the doctrine of primary jurisdiction, the court remarked that the doctrine provides courts with the advantage of an agency's view on complex issues within the agency's special experience and expertise with which judges and juries have limited knowledge, and so requires implicated claims to be channeled through the agency's process. Nevertheless, the court determined that, "because the issues relevant to the latency of [Herold's] occupational disease are not peculiarly within the [Workers' Compensation] Board's expertise, [Herold] may commence civil proceedings in an appropriate court of original jurisdiction." *Id.* at 506. Accordingly, the Commonwealth Court affirmed the trial court's order denying summary judgment and remanded the matter to that court for further proceedings.

The University sought further review, and we granted allocatur to consider whether the ODA's exclusivity provision, or the doctrine of primary jurisdiction, mandates that the Board, rather than a trial court, has jurisdiction over an injured worker's claim for a disability or death resulting from an occupational disease and that occurs outside of the four-year period contained in the ODA.[7]

---

[7] As the University's issues raise pure questions of law, our standard of review is *de novo* and our scope of review is plenary. *Buffalo Township v. Jones*, 813 A.2d 659, 664 n.4 (Pa. 2002). Moreover, as we are reviewing the denial of a motion for summary judgment, we view the record in the light most favorable to the non-moving party. *Summers v. Certainteed Corp.*, 997 A.2d 1152, 1159 (Pa. 2010) ("When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party. . . . In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment where the right to such judgment is clear and free from all doubt." (citation and quotations omitted)).

The University argues that the Commonwealth Court erred in finding that Herold's occupational disease falls outside the ODA and the purview of the Board. First, the University recounts the flawed framework to recover compensation for workplace injuries which existed at the turn of the 20th Century and which led to the enactment of workers' compensation legislation. The University surveys the relevant provisions of the WCA and ODA, focusing on the exclusive remedy provision in Section 1403 of the ODA which expressly "operate[s] as a surrender by the parties . . . of their rights to any form or amount of compensation or damages for any disability or death resulting from occupational disease, or to any method of determination thereof, other than as provided in article three of this act." Appellant's Brief at 22 (quoting 77 P.S. § 1403) (emphasis omitted). Thus, the University maintains that, by its express terms, the exclusive method to adjudicate a claim for disability or death caused by an occupational disease under the ODA — including factual determinations about the date of manifestation and the amount of compensation potentially available — is through the ODA's administrative process, rather than litigation in a trial court. Moreover, the University submits that, in cases where there is a question about which tribunals have jurisdiction, our Court has found that the trial court should defer to the administrative scheme. *See Lord Corporation v. Pollard*, 695 A.2d 767 (Pa. 1997) (plurality). The University adds that the doctrine of primary jurisdiction, under which deference is owed to administrative agencies, is implicated as well and suggests that the purpose of submitting claims under the ODA to the exclusive jurisdiction of the Board is "to ensure consistency and uniformity in adjudication of workers' claims against their employers." Appellant's Brief at 26.

Specifically, the University contends that the Commonwealth Court erred in failing to uphold the ODA's exclusive remedy provision. While the Commonwealth Court recognized an exception to the exclusivity provision for occupational injuries manifesting

after the ODA's four-year limitation period, *i.e.*, when the disease is no longer "compensable," the University stresses that there is no support for such an exception in either the plain language of the ODA (urging that compensability is not a prerequisite to the application of the exclusive remedy provision) or case law. Appellant's Brief at 28. Indeed, pointing to the statutory language, the University contends that the ODA does not identify "compensability" as a necessary prerequisite for the exclusive remedy provision to apply. The University further points out that courts previously have declined to find exceptions to the ODA's exclusive remedy provision. *See Barber*, 555 A.2d at 769 (holding that the ODA provides the exclusive remedy for asbestos-related disease even when the plaintiffs alleged that their injuries were intentionally inflicted by their employer). In the University's view, Section 1403 "requires employees to accept the provisions of article three of the ODA (which necessarily includes the temporal limitation set forth in Section [1401(c)]) and surrender their rights to 'any form or amount of compensation or damages,'" regardless of compensability. Appellant's Brief at 32 (citing 77 P.S. § 1403). According to the University, this "may mean no compensation under certain circumstances," as well as the surrender of certain methods for determining compensation, including by a civil trial. Appellant's Brief at 32-33.

Additionally, the University faults the Commonwealth Court for improperly relying upon our decision in *Tooey* when interpreting Section 1401(c) of the ODA. The University would limit *Tooey* to the specific language of Section 411(2) of the WCA, which, the University maintains, is substantially different from the operative language in the ODA. To illustrate this point, the University highlights that the language in Section 411(2) of the WCA at issue in *Tooey* provides that "whenever occupational disease is the basis for compensation, for disability or death under this act, ***it*** shall apply only to disability or death resulting from such disease and occurring within three hundred weeks after the last date

of employment in an occupation or industry to which he was exposed to hazards of such disease." 77 P.S. § 411 (emphasis added). The University explains that, while our Court interpreted the term "it" as referring to "this act," the same cannot be said for "it" in Section 1401(c) of the ODA, because replacing the word "it" with "the act" results in an "illogical sentence," which would read as follows: "Wherever *compensable disability or death* is mentioned as a cause for compensation under *this act*, **[the act] shall mean only** compensable disability or death resulting from occupational disease and occurring within four years after the date of his last employment in such occupation or industry." Appellant's Brief at 40 (emphasis, bolding, and brackets original). In the University's view, "it" must instead refer to "compensable disability or death," observing that replacing "it" with that phrase results in a sentence which is both appropriate and meaningful: "Wherever *compensable disability or death* is mentioned as a cause for compensation under *this act*, **compensable disability or death** shall mean only compensable disability or death resulting from occupational disease and occurring within four years after the date of his last employment in such occupation or industry." *Id.* (emphasis and bolding original). Moreover, the University claims that replacing the word "it" with "the act" is grammatically incorrect.

Next, the University takes issue with the Commonwealth Court's construction of Section 1401(c) of the ODA. Specifically, the University points out that the Commonwealth Court erroneously stated that Section 1401(c) of the ODA provides no compensation for disability or death manifesting more than four years after an employee's last "exposure" to hazards, when, by its terms, Section 1401(c) denies compensation for disability or death manifesting more than four years "after the date of his last employment." 77 P.S. § 1401(c). The University maintains that Herold's occupational disease claim arguably meets the four-year temporal limitation in Section 1401(c), as he

was last employed by the University in June 2015, and his symptoms manifested in October 2018, less than four years from his last date of employment. Related thereto, the University argues that the Commonwealth Court's remand to the trial court for a determination of this question violates the doctrine of primary jurisdiction.

The University then pivots, suggesting that mesothelioma might fall within Section 1401(i) of the ODA, which removes time limitations for a variety of latent occupational diseases, including "asbestosis," a disease involving exposure to asbestos which the University claims is akin to mesothelioma, and urges our Court to interpret the term "asbestosis" in Section 1401(i) of the ODA to include "mesothelioma," asserting that it would preserve the legislative intent of the ODA to provide occupational disease benefits regardless of the amount of time between the date of last employment and the disability claimed. Appellant's Brief at 44-45.

The University then provides additional arguments for reversal, including that the workers' compensation system was not designed to provide compensation under all circumstances, citing the limitation on compensation benefits based upon years of employment in the Commonwealth. 77 P.S. § 1401. The University adds that allowing mesothelioma claimants to take their claims into the tort system creates a "privileged" class of those afforded special rights other occupational disease claimants do not enjoy. Appellant's Brief at 46. The University cautions that the Commonwealth Court's opinion opens the door for claimants with occupational diseases which are not compensable or fully compensable under the ODA to seek redress in the civil courts, leading to uncertainty and confusion among employees, employers, and the public at large.

The University posits that any perceived inequities in recovery and the application of the exclusive remedy provision is for the General Assembly to remedy. Furthermore, the University submits that our Constitution does not guarantee a remedy or

compensation for every alleged wrong but, consistent with due process, only entitles an injured employee to an administrative process and forum in which to seek redress for a work-related disease. Indeed, the University offers that a guarantee of monetary compensation is not contained in the ODA, WCA, or our Constitution. The University suggests that deleterious effects will occur if we allow such access to civil courts, including forcing employers like itself to redirect resources for public education and research, and exposing them to "unlimited amounts for subjective jury verdicts that may award compensation for pain and suffering and, potentially, punitive damages — remedies not available or contemplated in the workers' compensation scheme." *Id.* at 52. The University avers that construing the ODA to permit claims for mesothelioma in civil courts is akin to promulgating an *ex post facto* law, stressing that employers reasonably relied on the "agreement" between employers and employees; ignoring this contract, it submits, upends the workers' compensation system, causes monetary harm, and infringes upon the substantive rights of employers. *Id.* at 53. The University claims that workers' compensation insurance is unavailable for such mesothelioma claims and that general liability insurance does not provide coverage for such awards, resulting in awards potentially being paid out of "funds intended for the academic and research programs that benefit not only students, but the public in general." *Id.* at 55. Indeed, the University goes so far as to warn that permitting claims for occupational diseases outside of the workers' compensation system "threatens the financial foundation on which its educational mission depends." *Id.* at 56.

*Amici* Pennsylvania State University and Temple University filed a joint brief in support of the University, and provide beneficial advocacy, although they make arguments which largely track those made by the University. *Amici* accuse the Commonwealth Court of substituting its policy concerns for the plain language of the ODA

and submit that our Court is bound to accept the legislative judgments made in the ODA. *Amici* note that plaintiffs like Herold are not without a remedy for their disease, as they may assert tort claims against manufacturers or suppliers of products to which they were exposed during their employment. They proffer that the ODA's exclusivity provision is essential to the "compromise" which they describe as no-fault liability on one hand, and limitations on exposure, *i.e.*, tort immunity, on the other. According to *Amici*, the time limitation was designed to prevent stale claims, and they suggest it functions "similarly to a statute of repose." *Amici's* Brief at 30. *Amici* also aver that allowing a tort remedy for some claims is unfair to workers, creating two classes of employees, as well as to employers, who face exposure due to liability not covered by other insurance policies.

In response, Executor begins by emphasizing that, without the Commonwealth Court's interpretation of the ODA, a worker in Herold's position will have no opportunity to obtain the certain compensation that is an essential part of the *quid pro quo* between employer and employee. Specifically, he points to the similarities between the ODA and the WCA, including that both statutes are designed to provide "certain" compensation to employees who are injured in the course of their employment and that Section 411(c) of the WCA and Section 1401(c) of the ODA contain similar temporal limitations. Based on these similarities, Executor suggests, consistent with the Commonwealth Court's opinion below, that we should interpret Section 1401(c) of the ODA in the same manner as we construed Section 411(2) of the WCA in *Tooey*, and thereby allow him to maintain a common law action.

Specifically, Executor argues that the ODA applies to disabilities and death caused by an occupational disease as defined in that statute. 77 P.S. § 1201. Like the Commonwealth Court, he offers that the word "it" in Section 1401(c) refers to the immediately preceding noun phrase "this act," reading the provision as follows:

> Wherever compensable disability or death is mentioned as a cause for compensation under this act, *[this act]* shall mean only compensable disability or death resulting from occupational disease and occurring within four years after the date of his last employment in such occupation or industry.

77 P.S. § 1401(c). Executor maintains that this interpretation is the most grammatically correct and reasonable interpretation of Section 1401(c), and he criticizes the University's substitution of the phrase "compensable disability or death" in the place of "it" as creating mere surplusage, improperly substituting the singular pronoun "it" for the plural term "compensable disability or death," and engaging in an "overly complex, grammatical examination," contrary to the plain language of the statute. Appellee's Brief at 17.

Executor asserts that Herold's mesothelioma is not covered or compensable, agreeing with the Commonwealth Court that the exclusive remedy provision in Section 1403 of the ODA "extends only to those claims asserting compensable disability or death resulting from occupational disease and manifesting within 4 years after the last workplace exposure." *Herold*, 291 A.3d at 504. He points out that mesothelioma is not one of the four enumerated occupational diseases that have no temporal limitation under the ODA. 77 P.S. § 1401(i). Thus, because Herold's mesothelioma is not an occupational disease, and it did not cause disability or death within four years of his last date of exposure to asbestos, Executor argues that the exclusivity provision does not apply, and so he may bring a civil action.

Moreover, Executor contends that, as Herold did not suffer from asbestosis, a listed "occupational disease" under Section 1201, his mesothelioma would have to meet the definition of Section 1208(n) of the ODA, which provides that an occupational disease is a disease: (1) to which the claimant is exposed by reason of his employment; (2) which is peculiar to the industry or occupation; and (3) which is not common to the general population. Executor argues that Herold's mesothelioma does not meet these

requirements, observing that the expert reports relied upon by the University indicate that asbestos (the sole cause of mesothelioma) can be found in a variety of products which are not exclusive to the industry in which he was employed. Additionally, Executor asserts that mesothelioma is not a disease which is exclusively related to occupational exposures.[8]

Executor then urges that, even if Herold's mesothelioma is a covered occupational disease, it is not compensable, as it did not occur and cause disability or death within four years of exposure to asbestos, as the ODA requires. Executor contends that our Court in *Tooey* resolved the issue of coverage versus compensation by finding that the exclusive remedy provision of the WCA did not bar a common law action for a long latency disease that is covered, but not compensable. Building upon this, and citing the Commonwealth Court's decision below, Executor explains that, under Section 1403, an

---

[8] We disagree. Unlike the WCA, the ODA does not define mesothelioma as an occupational disease. *Compare* Section 108 of the WCA, 77 P.S. § 27.1 (including cancer caused by asbestos exposure), *with* Section 108 of the ODA, 77 P.S. § 1208 (not including cancer caused by asbestos exposure). However, as the Commonwealth Court found, in our view, mesothelioma manifestly qualifies as an occupational disease under Section 1208(n) of the ODA. *See* 77 P.S. § 1208(n) ("All other occupational diseases (1) to which the claimant is exposed by reason of his employment, and (2) which are peculiar to the industry or occupation, and (3) which are not common to the general population."); *see also Sedlacek v. A.O. Smith Corp.*, 990 A.2d 801, 804 (Pa. Super. 2010), *abrogated on other grounds in Tooey*, 81 A.3d 851 (Pa. 2013) (asserting without citation that the "catch-all definition [of the ODA] ... has been viewed as including [mesothelioma]"). Indeed, the University's question certified for interlocutory appeal to the Commonwealth Court implied that the court presumed mesothelioma was an occupational disease under the ODA. *See* Cmwlth. Ct. Order, 10/25/21, at 1 ("Herold has been diagnosed with asbestos-related mesothelioma, an occupational disease as defined in the [ODA.]"). Our order granting allocatur suggests the same. *See Herold v. University of Pittsburgh - of Commonwealth System of Higher Education*, 305 A.3d 957 (Pa. 2023) (order) (granting allocatur on whether the Commonwealth Court's decision "(1) fails to overrule the [t]rial [c]ourt's determination that the [t]rial [c]ourt, rather than the workers' compensation authorities, has subject matter jurisdiction over Mr. Herold's asbestos-related occupational disease claim against his employer under the ODA"). Thus, we find that mesothelioma is an occupational disease covered by the ODA.

employee does not surrender his right to a remedy where there is no opportunity to be compensated under the ODA. 77 P.S. § 1403. Indeed, Executor complains that a contrary result would violate the reasonable compensation mandate of Article III, Section 18[9] and the open courts provision of Article I, Section 11[10] of the Pennsylvania Constitution. He also asserts that the purpose of the ODA is to enhance recovery for injured workers, and the *quid pro quo* underlying the workers' compensation system

---

[9] Article III, Section 18 provides:

> The General Assembly may enact laws requiring the payment by employers, or employers and employees jointly, of reasonable compensation for injuries to employees arising in the course of their employment, and for occupational diseases of employees, whether or not such injuries or diseases result in death, and regardless of fault of employer or employee, and fixing the basis of ascertainment of such compensation and the maximum and minimum limits thereof, and providing special or general remedies for the collection thereof; but in no other cases shall the General Assembly limit the amount to be recovered for injuries resulting in death, or for injuries to persons or property, and in case of death from such injuries, the right of action shall survive, and the General Assembly shall prescribe for whose benefit such actions shall be prosecuted. No act shall prescribe any limitations of time within which suits may be brought against corporations for injuries to persons or property, or for other causes different from those fixed by general laws regulating actions against natural persons, and such acts now existing are avoided.

Pa. Const. art III, § 18.

[10] Article I, Section 11 provides:

> All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.

Pa. Const. art I, § 11.

includes assured recovery for disabled workers; these principles would be undercut if a claimant had no opportunity for compensation. Finally, Executor presses that the doctrine of primary jurisdiction does not compel a different result, as Herold's claim is outside of the jurisdiction of the workers' compensation system and the factual questions at issue are of the type that trial courts make every day.

In its brief filed on behalf of Executor, *Amicus* Pennsylvania Association for Justice agrees with the Commonwealth Court that, pursuant to *Tooey*, Section 1401(c) of the ODA excludes Herold's claim because his mesothelioma manifested more than four years after the date of his last exposure, that the doctrine of primary jurisdiction was not implicated in this case, and warns that requiring Herold and similarly situated workers to pursue "obviously futile claims in the workers' compensation system before pursuing a negligence claim would have disastrous practical implications." *Amicus'* Brief at 5.

*Amici* Darlene Data and Ronald Holby, in support of Executor, argue that the WCA applies to this matter, not the ODA, which *Amici* describe as "functionally archaic." *Amici's* Brief at 3. Specifically, *Amici* note that the WCA broadly applies to "injury," "personal injury," and "injury arising in the course of his employment." 77 P.S. § 411(2). *Amici* add that Section 411(2) also provides, in relevant part, that it "shall apply only with respect to the disability or death of an employe which results in whole or in part from the employe's exposure to the hazard of occupational disease after June 30, 1973 in employment covered by The Pennsylvania Workmen's Compensation Act." *Id.* Similarly, *Amici* cite to *Pawlosky*, *supra*, wherein we opined that, "the legislature, by including occupational diseases in the [WCA]'s concept of 'injury', was attempting to create a unified, integrated compensation law for all work-related harm occurring after the effective dates of the 1972 amendments." 525 A.2d at 1210. In light of all of this, *Amici* maintain that, given that Herold's exposure to occupational disease occurred after June 30, 1973, the WCA

governs this matter, and Herold's common law claims are permissible pursuant to *Tooey*. Notably, *Amici* concede that neither of the parties nor the courts below addressed 77 P.S. § 411(2), or an argument thereunder that the ODA is inapplicable here, but offer that the Commonwealth Court's decision may be affirmed if correct for any reason.

The question before us calls for statutory interpretation. Our interpretation of the statutes of the Commonwealth is guided by the Statutory Construction Act of 1972. 1 Pa.C.S. § 1501. Indeed, the General Assembly has mandated that the interpretative provisions of this act apply to all statutes. 1 Pa.C.S. § 1502(a)(1), (2); *id.* § 1901. The polestar in engaging in statutory interpretation is to discern the intent of the General Assembly. 1 Pa.C.S. § 1921(a) ("The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly.").

In engaging in statutory interpretation, the Statutory Construction Act provides, and our courts have engaged in, a well-established framework to discern legislative intent. Courts are confronted with an initial inquiry: whether the statutory language is plain and unambiguous. If the meaning of the word or language employed is unmistakable, courts construe the statute according to its clear meaning. *Id.* § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.").

If, however, the statutory language is not explicit, but, rather, is susceptible to two or more reasonable interpretations, the statute is deemed to be ambiguous. *Delaware County v. First Union Corp.,* 992 A.2d 112, 118 (Pa. 2010); *Snyder Brothers, Inc. v. Pennsylvania Public Utilities Commission,* 198 A.3d 1056, 1073 (Pa. 2018) ("If a statutory term, when read in context with the overall statutory framework in which it appears, has at least two reasonable interpretations, then the term is ambiguous."). In construing and giving effect to the text, courts "should not interpret statutory words in isolation, but must

read them with reference to the context in which they appear." *Roethlein v. Portnoff Law Assoc.,* 81 A.3d 816, 822 (Pa. 2013) *citing Mishoe v. Erie Insurance Co.,* 824 A.2d 1153, 1155 (Pa. 2003)); *see generally King v. Burwell,* 576 U.S. 473, 486 (2015) ("If the statutory language is plain, we must enforce it according to its terms. But oftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. So when deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme." (internal quotation marks and citations omitted)).

When analyzing an ambiguous statute, courts discern legislative intent by considering some or all of the factors the General Assembly has identified. 1 Pa. C.S. § 1921(c) ("When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters: [certain enumerated factors].") Moreover, courts may consider various other factors in addition to those set forth in Section 1921(c) to guide them in determining the General Assembly's intent. *See, e.g.,* 1 Pa. C.S. § 1922 (describing presumptions, including that the legislature does not intend a result that is absurd or unreasonable); 1 Pa. C.S. § 1925 (constitutional construction of statutes); and 1 Pa. C.S. § 1928 (rules regarding strict and liberal construction).

Thus, employing this well-trodden analytical construct, we consider whether the meaning of the words of the statute are explicit or ambiguous. The parties first analyze Section 1401(c) of the ODA, which contains a time limitation for compensable claims, and so we do likewise. As noted *supra*, Section 1401(c) provides:

> Compensation for the occupational diseases enumerated in this act shall be paid only when such occupational disease is peculiar to the occupation or industry in which the employe was engaged and not common to the general population. Wherever compensable disability or death is mentioned as a cause for compensation under this act, ***it*** shall mean only

> compensable disability or death resulting from occupational disease and occurring within four years after the date of his last employment in such occupation or industry.

77 P.S. § 1401(c) (emphasis added).

As noted above in greater detail, the University argues that the meaning of the word "it" is clear and unambiguous. The University relies upon both grammatical rules and logic to support its position that the word "it" refers solely to the prior phrase "compensable disability or death." In short, and critiquing the Commonwealth Court's interpretation, the University submits that, not only is substitution of "the act" for the pronoun "it" grammatically improper, but doing so results in a stilted and unnatural sentence.

Executor, also taking a plain meaning approach, counters, offering his own grammatical critique of the proffered meaning of the word "it" and claims that the term refers to the immediately preceding noun, "this act." Executor stresses that it would violate the rules of grammar to use the singular pronoun "it" for the plural phrase "compensable disability or death." Moreover, Executor rebuffs the University's proposed construction, asserting that it would lead to multiple redundancies in the use of the phrase "compensable disability or death," resulting in surplusage. Additionally, in contrast to the University's interpretation, Executor argues that his suggested interpretation of the phrase "the act" in place of the word "it" would result in a cleaner reading of the statutory language compared to the duplicative use of the phrase "compensable disability or death" suggested by the University.

Initially, before resolving these competing, grammatically-based interpretations, we note that there is some tension in the guidance the legislature has provided to the courts regarding statutory interpretation in this regard. The Statutory Construction Act provides that "[w]ords and phrases shall be construed according to rules of grammar and

according to their common and approved usage." 1 Pa.C.S. § 1903(a). However, it also cautions that grammatical errors "shall not vitiate a statute." 1 Pa.C.S. § 1923(a). Related thereto, both the ODA and the Statutory Construction Act indicate that singular and plural may be treated interchangeably. *See* 77 P.S. § 1202 ("Wherever in this act the singular is used, the plural shall be included."); 1 Pa.C.S. § 1902 ("The singular shall include the plural, and the plural, the singular.").

Here, application of these tools of construction to the rules of grammar is unclear. As a result, we believe that both parties have set forth reasonable grammatical bases for their respective interpretations of the meaning of the word "it." Yet, we find that both interpretations suffer from drawbacks regarding the fluidity and clarity of the challenged sentence. The University's proffered interpretation contains multiple unnecessary redundancies, and Executor's interpretation leads to somewhat stilted phrasing, as in "this act shall mean," which could be accomplished more directly. In short, we find the statutory language to be ambiguous.

As noted above, typically, after finding statutory language to be ambiguous, a court would engage in consideration of the relevant tools of statutory construction to discern the legislature's intent regarding its meaning. However, we believe that employment of either party's proffered tools of statute construction lead to the same place.

Section 1401 is a definitional provision which gives *meaning* to the phrase "compensable disability or death," and places a time limit on when a disability or death is compensable. Specifically, the University's suggested phrasing reads:

> Wherever compensable disability or death is mentioned as a cause for compensation under this act, ***[compensable disability or death]*** shall mean only compensable disability or death resulting from occupational disease and occurring within four years after the date of his last employment in such occupation or industry.

Similarly, Executor's interpretation would have the statute read:

> Wherever compensable disability or death is mentioned as a cause for compensation under this act, *[this act]* shall mean only compensable disability or death resulting from occupational disease and occurring within four years after the date of his last employment in such occupation or industry.

The language of Section 1401 can be contrasted with the similar, albeit distinct, provision in the WCA which was the focus in *Tooey*. *See* 77 P.S. § 411. Section 411 of the WCA provides in relevant part:

> [W]henever occupational disease is the basis for compensation, for disability or death under **this act, it shall apply** only to disability or death resulting from such disease and occurring within three hundred weeks after the [last occupational exposure].

77 P.S. § 411(2) (emphasis added). Thus, while the two provisions — Section 1401 of the ODA and Section 411 of the WCA — are similar, they are at least in one respect distinct, as Section 411 of the WCA defines the applicability of the statute, *i.e.*, it is a jurisdictional limitation on that statute as we found in *Tooey*, whereas Section 1401 of the ODA merely qualifies the meaning of "compensable disability or death" as used in the statute.

The Commonwealth Court below recognized as much in its analysis: The court explained that the legislature chose language in Section 411 that conveyed a jurisdictional limit, removing from the WCA's purview claims involving a latent occupational disease that manifests beyond the limitations period. *See Tooey*, 81 A.3d at 859-60 ("[[T]he act] **shall apply only** to disability or death [arising from occupational disease that manifests within 300 weeks]." (emphasis added)); *Herold*, 291 A.3d at 502. By contrast, the Commonwealth Court reasoned that, under the ODA, "there is no jurisdictional implication

to the relevant statutory language. Rather, the plain language of Section [1401(c)] merely refines the definition of 'compensable disability or death.'" *Herold*, 291 A.3d at 502.

In our view, whether we use "compensable disease or death" as proffered by the University or "this act" as argued by Executor, the meaning of "compensable disability or death" is temporally qualified as later specified in the provision. That is, we simply do not discern the import of choosing one interpretation over the other.[11] Far from being dispositive of the ultimate question before our Court regarding the breadth of the ODA's exclusivity provision, we conclude either interpretation serves to confine the meaning of "compensable disability or death" to "only compensable disability or death resulting from occupational disease and occurring within four years after the date of his last employment in such occupation or industry." 77 P.S. § 1401(c).[12] Nonetheless, the ODA's time limitation provision becomes critical to our analysis of the ODA's exclusivity provision, which we turn to next.

The crux of this appeal is the breadth of the ODA's exclusivity provision. Section 1403 provides:

> Such agreement shall constitute an acceptance of all the provisions of article three of this act, and shall operate as a surrender by the parties thereto of their rights to any form or

---

[11] Notably, the phrase "compensable disability or death" is not used again in the ODA outside of this definitional section.

[12] The University asserts that Executor could invoke the ODA savings clause to obtain relief beyond the four-year limitations period. Appellant's Brief at 44-45. Section 1401(i) provides relief beyond the four-year limitations period for claimants suffering from certain express diseases: "Notwithstanding any other provisions of this act, compensation for silicosis, anthraco-silicosis, coal worker's pneumoconiosis, and asbestosis shall be paid for each month[.]" 77 P.S. § 1401(i). Herold did not contract one of those diseases, and absent from this list is mesothelioma. We decline the University's invitation to find asbestosis includes mesothelioma, a distinct disease. Therefore, for purposes of the ODA, we find the trial court and Commonwealth Court correctly determined that the statute's savings clause is inapplicable. *See* Trial Ct. Op. at 2-3; *Herold*, 291 A.3d at 495 n.12.

> amount of compensation or damages for any disability or death resulting from occupational disease, or to any method of determination thereof, other than as provided in article three of this act. Such agreement shall bind the employer and his personal representatives, and the employe, his or her wife, or husband, widow or widower, next of kin, and other dependents.

77 P.S. § 1403 (footnote omitted).

The University argues, in sum, that the ODA does not require a claimant's occupational disease to be compensable for the exclusivity provision to apply, but, rather, under a plain reading of that provision, and focusing upon the phrase "for any disability or death," it contends that the exclusivity provision applies to occupational diseases regardless of whether they manifest within the time limitations prescribed by the ODA in Section 1401. That is, the University asserts that compensability is irrelevant to the scope of the exclusivity provision. Thus, according to the University, even if an injured employee's disability or death occurs outside of Section 1403's four-year limitations period, the injured employee could not receive compensation, as the ODA's exclusivity provision bars such claims. The University adds that *Tooey* involved the interpretation of specific language in the WCA that does not exist in the ODA, and, therefore, is inapplicable to this matter.

In contrast, Executor emphasizes that, under the exclusivity provision, employees surrender "their rights to any form or amount of compensation or damages" other than provided by the ODA. Appellee's Brief at 40. Executor develops that, as the exclusivity provision requires *some* form or amount of compensation be available to surrender, and, as Section 1403 limits compensation to disability or death occurring within four years after the date of one's last exposure, the exclusivity provision does not apply to Herold's non-compensable (as it occurred beyond four years after his last exposure) disability or death claim; thus, his common law claim is not barred. *Id.* at 41.

After considering the parties' arguments advanced above, as well as the statutory language employed by the General Assembly placed in the context of the provisions of the ODA, we find the exclusivity provision to be ambiguous in this regard, as there are competing reasonable interpretations. The broad interpretation advanced by the University, based upon the statutory language applying the exclusivity provision to "*any* disability or death," is reasonable. 77 P.S. §1401. Likewise, however, Executor's interpretation, focusing on the provision's language regarding the forfeiting of the right to compensation outside of the workers' compensation system, and carving out an exception to exclusivity where there is no compensation available within the system, is reasonable as well.

This being the case, as instructed by the General Assembly, we turn to the enumerated tools of statutory construction to discern its intent. These factors are:

> (1) The occasion and necessity for the statute.
> (2) The circumstances under which it was enacted.
> (3) The mischief to be remedied.
> (4) The object to be attained.
> (5) The former law, if any, including other statutes upon the same or similar subjects.
> (6) The consequences of a particular interpretation.
> (7) The contemporaneous legislative history.
> (8) Legislative and administrative interpretations of such statute.

1 Pa.C.S. § 1921(c).

In addressing these factors, we initially consider the origins of workers' compensation laws generally, and the ODA in particular, including the "Grand Bargain" or "*quid pro quo*" which serves as the foundation of all worker injury compensation laws. *Barber*, 555 A.2d at 769-70; *see* Ellen Relkin, *The Demise of the Grand Bargain: Compensation for Injured Workers in the 21st Century*, 69 Rutgers U.L. Rev. 881, 883

(2017); Robert F. Williams, *Can State Constitutions Block the Workers' Compensation Race to the Bottom?*, 69 Rutgers U.L. Rev. 1081, 1082 (2017).

During the 1800's and into the early 1900's, with the advent of the industrial revolution and the explosion of factory work, there came a drastic increase in workplace injuries and death. Recovery for such injuries was complicated and difficult. Specifically, injured workers in this time rarely brought lawsuits against their employers due in part to a prevailing fear of resulting unemployment, the lack of legal resources, the cost of litigation, and the Herculean task of proving an employer's negligence. Establishing an employer's negligence was especially onerous because of the limited duties employers owed their workers; thus, it was especially difficult for workers to prove a breach of duty. Perhaps more fatal to an injured worker's recovery were three common law defenses to employer liability for negligently-caused injuries called the "unholy trinity" — the assumption of risk doctrine, the fellow servant rule (holding employers immune from liability to its workers because of negligence of a fellow employee),[13] and the doctrine of contributory negligence. Emily A. Spieler, *(Re)assessing the Grand Bargain: Compensation for Work Injuries in the United States, 1900-2017*, 69 Rutgers U.L. Rev. 891, 901 n.35 (2017). Together, these defenses served to largely insulate employers from adverse judgments.

The playing field, however, was not tilted exclusively in favor of employers. Those injured employees who were able to establish negligence, and who were able to surmount employer defenses, were at times rewarded with significant monetary jury awards, including for pain and suffering, loss of consortium, as well as punitive damages, leaving employers both with potentially large monetary outlays, and without an ability to estimate such costs in their business finances. In addition to employers being subjected to

---

[13] *Ryan v. Cumberland Valley Railroad Company*, 23 Pa. 384 (Pa. 1854)

substantial verdicts, insuring for such employer liability was expensive, and tension existed in labor management relations due to the lack of compensation for workplace injuries. *See* David Torrey, *The Centennial of the Pennsylvania Workers' Compensation Act*, 28-29 (The Pennsylvania Bar Association 2015). Thus, for employers, civil actions had, despite the availability of tort law defenses, become costly and unpredictable. Indeed, the existing civil system was viewed as unsatisfactory by both employees and employers. As explained by Lawrence Friedman, the law of "industrial accidents" at this time was "no longer an efficient device for allocating costs. It did not have the courage of its cruelty, nor the strength to be humane. It satisfied neither capital nor labor. It siphoned millions of dollars into the hands of lawyers, court systems, administrators, insurers, claims adjustors. Companies spent and spent, yet did not buy industrial harmony – and not enough of the dollars flowed to the injured workmen." Friedman, A History of American Law, 424-25 (Simon and Schuster, New York (ed. 1973)).

Because of this mutual dissatisfaction with the common law negligence system for remedying workers for their work-related injuries, and by broad social consensus, the demand for an efficient, low-cost process by which to secure compensation for injured workers emerged. In the early twentieth century, along with most other states, Pennsylvania began to seriously consider workers' compensation legislation. Prompted by society's belief, writ large, that it had a "moral obligation to remedy workplace injuries and accidents,"[14] particularly in Pittsburgh, which became an epicenter of the crisis and the subject of a renowned study by Crystal Eastman,[15] a commission was established in

---

[14] Michael C. Duff, *A Hundred Years of Excellence: But Is the Past Prologue? Reflections on the Pennsylvania Workers' Compensation Act*, 87 Pa. B.A. Q. 20 (The Pennsylvania Bar Association 2016).

[15] Crystal Eastman, *Work Accidents and the Law* (The Russel Sage Foundation, New York (1910)).

1911 by the Commonwealth to make recommendations with regard to the advisability and form of such legislation, which culminated in the Workers' Compensation Act of 1915.[16]

The original legislation, however, intentionally omitted coverage for occupational disease. By the mid-1930's, the idea that workers should assume the risk of disease injury as part of their efforts to make a living had come under attack, and political and social pressures for the law to cover clearly related occupational diseases could no longer credibly be resisted by industry. As a result, the 1937 amendments to the Act added coverage for certain occupational diseases. While that legislation was short-lived, the legislature in 1939 enacted a new, but related law, the ODA. This statute was modeled on the WCA even though, unlike a traumatic injury caused by an accident in the workplace, the onset of an occupational disease is not readily determinable.

Broadly, these statutory compensation systems for work-related injuries were founded upon a mutually agreeable compromise. Generally speaking, workers gave up the right to sue their employers for job-related injuries and uncertain common law tort remedies in return for certain, but reduced, benefits, without an assessment of fault of the employer. In turn, employers embraced a no-fault system and gave up the unholy trinity of defenses in return for the elimination of trial by jury, and the potential of punitive damages and exorbitant unexpected costs. This compromise became the bedrock of all workers' compensation laws and is known as the "Grand Bargain."

Our Court has described this *quid pro quo* in the context of the ODA as follows:

> In each instance, the employer, in exchange for immunity from lawsuits by injured employees, provides certain and reasonable compensation to injured employees without regard to fault. By the same token, the employee relinquishes his right to sue at common law in exchange for a certain

---

[16] David B. Torrey, *100 Years of Pennsylvania Workers' Compensation: History, the Current Scene, and Challenges Ahead*, 87 Pa. B.A.Q. 6, 7 (2016).

reasonable recovery for injuries he suffers in the course of his employment.

*Barber*, 555 A.2d at 769-70.

Indispensable to the Grand Bargain is certain compensation for the injured worker: "The ODA and the WCA are similar statutes, designed to provide certain compensation for employees injured in the course of their employment." *Id.* at 769; *see also Alston v. St. Paul Insurance Companies*, 612 A.2d 421, 424 (Pa. 1992); Kevin R. Sander, *The Cold Shoulder of Occupational Disease Recovery: Ganske v. Spahn & Rose Lumber Co.*, 25 J. Corp. L. 407, 413-14 (2000) ("The exclusiveness of these statutes arose from the *quid pro quo* rationale" where an employee "receives a guaranteed recovery under the statutes, while the employer is no longer concerned about the risk of large-scale liability under traditional common law claims. The goal in enacting these statutes was to speed up the overall process of workers' compensation and reduce the cost for all parties involved." (footnotes omitted)). While the University's articulation of the Grand Bargain stresses the exclusive administrative process to resolve claims of work-related injuries, its view of the bargain centers on the interests of the employer with little accounting for the core interest of the injured worker — compensation.

Equally important, the *quid pro quo* is implemented, in part, via the "exclusive remedy doctrine." The exclusivity of the statutory remedy, and requirement of the administrative process, is part of "the historical quid pro quo that employers received in return for being subjected to a statutory, no-fault system of compensation for worker injuries." *Poyser v. Newman & Co., Inc.,* 522 A.2d 548, 550 (Pa. 1987). The WCA and ODA are intended to provide the exclusive means for obtaining compensation for injuries, substituting for common law tort actions. 77 P.S. § 481; 77 P.S. § 1403; *Kachinski v. Workmen's Compensation Appeal Board,* 532 A.2d 374 (Pa. 1987). An exclusivity provision restricts the remedies available to an employee for injuries sustained in the

course of employment and closes any recourse against the employer at common law for negligence. *Tsarnas v. Jones & Laughlin Steel Corporation,* 412 A.2d 1094 (Pa. 1980). As scholarly analysis of the doctrine of exclusivity has reasoned, however, there must be *some* possibility of recovery by the injured worker to justify the substitution of a statutory process for a common law civil action:

> If . . . the exclusiveness defense is a "part of the *quid pro quo* by which the sacrifices and gains of employees and employers are to some extent put in balance," it ought logically to follow that the employer should be spared damage liability only when compensation liability has actually been provided in its place, or, to state the matter from the employee's point of view, rights of action for damages should not be deemed taken away except where something of value has been put in their place.

6 Arthur Larson, *Larson's Workers' Compensation Law*, § 100.4 (2013) (footnotes omitted).

With this background, two essentials of the system become clear: (1) certain compensation for the injured worker without regard to fault; and (2) the exclusivity of the administrative forum for resolving such guaranteed compensation, *i.e.*, employer immunity from common law liability. We turn to relevant case law interpreting the exclusivity provisions under the WCA and the ODA, beginning with our decision in *Tooey*.

Over a decade ago, our Court in *Tooey* analyzed the circumstances in which an occupational disease, which manifested outside of the 300-week limitations period set forth in 77 P.S. § 411(2), removed the claim from the purview of the WCA, such that the WCA's exclusivity provision, 77 P.S. § 481, did not apply, and thus did not bar a common law action against an employer. The WCA time limitations period is akin to the limitations period found in the ODA, and provides that "whenever occupational disease is the basis for compensation, for disability or death under this act, it shall apply only to disability or death resulting from such disease and occurring within three hundred weeks after the last

date of employment in an occupation or industry to which [the claimant] was exposed to hazards of such disease." 77 P.S. § 411 (2).

In *Tooey*, employees were diagnosed with mesothelioma approximately 25 years after their last workplace exposure to asbestos. 81 A.3d at 856. The injured workers and their spouses commenced tort actions against their former employers; the employers moved for summary judgment, asserting that the plaintiffs' claims were barred by the WCA's exclusivity provision. *Id.* In response, the plaintiffs argued that the prolonged latency period of their mesothelioma removed their claims from the jurisdiction, scope, and coverage of the WCA. *Id.* The trial court agreed with the plaintiffs, but the Superior Court reversed, concluding that the WCA's exclusivity provision remained applicable, even though the plaintiffs' mesothelioma had manifested more than 300 weeks after their last employment, rendering their claims non-compensable under the workers' compensation system. *Id.* To resolve this distinction between the scope of coverage and the availability of compensation, we examined the language in Section 411 of the WCA, 77 P.S. § 411(2). *Tooey*, 81 A.3d at 857-60. That section placed a time limit on claims for occupational disease. Reading what we considered to be the plain language of the WCA's exclusivity provision as imparting a jurisdictional element to the limitations period — *i.e.*, that the WCA only applied to those claims manifesting within 300 weeks of exposure — we concluded that the WCA did not apply to latent occupational diseases that manifested more than 300 weeks after the last occupational exposure, and so the exclusivity provision did not preclude a common law action against an employer. *Id.* at 865.

Assuming, in the alternative, that the WCA was ambiguous, in this regard, we further reasoned that the remedial purpose and objectives of the WCA favored an interpretation that would permit the plaintiffs to proceed with their civil claims. *Id.* at 860-

65. In considering the parties' arguments on this point, certain themes resonated with our Court. On the one hand, the plaintiffs argued that, in those cases involving latent mesothelioma, the historic *quid pro quo* contemplated by the WCA's exclusivity provision could not be effectuated, as employers were, in effect, granted full immunity, with no reasonable chance of workers recovering compensation. *Id.* at 860. On the other hand, we recognized the long-standing distinction between coverage of a claim under the statute and compensation for a claim under that act. *See id.* at 862-63 (discussing cases). We specifically addressed the employers' characterization of Section 411 as "a statute of repose which serves as a legitimate temporal limitation on recovery, as opposed to a jurisdictional limitation of the [WCA]." *Id.* at 862. Our Court rejected this interpretation, stressing that "[i]t is inconceivable that the legislature, in enacting a statute specifically designed to benefit employees, intended to leave a certain class of employees who have suffered the most serious of work-related injuries without any redress under the [WCA] or at common law." *Id.* at 864.

We also dismissed concerns that permitting common law claims would expose employers to "potentially unlimited liability." *Id.* at 865. Referencing such requisites of tort liability such as proving negligence and causation, the *Tooey* Court concluded that common law claims arising from a latent occupational disease would not undermine the employer's side of the *quid pro quo* manifest in the workers' compensation system. *See id.* Additionally, giving the remedial purposes of the workers' compensation system its full due, the *Tooey* Court reasoned that the system's humanitarian objectives militated against interpreting Section 411 as a statute of repose. Thus, we held that the General Assembly did not intend the WCA's exclusivity provision to apply to claims for disability or death resulting from an occupational disease that manifests beyond the 300-week

limitations period, and that, as a result, the provision did not preclude the injured workers' common law actions.

Our Court's landmark decision in *Tooey* is instructive with respect to our statutory construction analysis *sub judice.* While we recognize the textual asymmetry of the exclusivity language used in the WCA and the ODA, the two provisions are nevertheless "very similar." *Barber*, 555 A.2d at 769 ("Although the language varies slightly, the exclusive remedy provisions of both the WCA and the ODA are very similar."). Thus, consistent with the spirit of Section 1922(4) (regarding legislature's intent relating to a subsequently enacted statute on same subject matter), and common sense, we conclude that exclusivity provisions in the statutes should be given a similar interpretation.

Indeed, our *Tooey* decision – which was filed in 2013 – apprised the General Assembly that the WCA, as interpreted by our Court, allowed a civil action for injuries for occupational diseases which manifested outside of the WCA's 300-week limitations period. Because of the similarity of the time periods set forth in the ODA and WCA, as well as their analogous exclusivity provisions, there was good reason for the legislature to conclude we would apply *Tooey*'s interpretation under the ODA.[17] Yet, in the past decade, the General Assembly has not acted to indicate it disagreed with *Tooey.*

The parties offer decisions in addition to *Tooey* which merit some discussion. The University points to a number of our decisions as supporting the proposition that the ODA's exclusivity provision eliminates any common law cause of action for an

---

[17] Our approach in this regard is akin to giving statutes that stand in *pari materia* similar constructions. 1 Pa.C.S. §§ 1921(a), 1932 (observing that statutes or parts of statutes *in pari materia* should be construed together, with the court giving effect to each provision, if possible). While the parties do not explicitly contend that the WCA and ODA stand in *pari materia*, the notion that these similar statutes dealing with similar subject matter should be interpreted consistently has great force. Thus, while *Tooey* interpreted the WCA's time limitations and exclusivity provisions, and, therefore, is not directly binding upon our interpretation of the ODA's time limitation and exclusivity provisions, we conclude there is good reason to interpret the two provisions consistently.

occupational disease. According to the University, the workers' compensation system was not intended to provide, in every case, either compensation for a workplace injury or an opportunity to seek redress at common law. *See Franczyk v. Home Depot, Inc.*, 292 A.3d 852, 863 (Pa. 2023) (rejecting assertion that claimant who was compensated under the WCA for a dog bite was able to bring a common law action against her employer for impairing her ability to file a third-party action against the dog owner); *Barber*, 555 A.2d at 769-70 (finding ODA's exclusivity provision bars common law claim for injuries caused by employer's intentional conduct); *Poyser*, 522 A.2d at 549 (rejecting injured worker's claim for tort recovery on the basis that his injury was caused by deliberate derelictions of the employer and refusing to recognize an exclusivity carve-out for an employer's intentional wrongdoing); *Kline v. Arden H. Verner Co.*, 469 A.2d 158, 160 (Pa. 1983) (determining that painter who fell from a ladder and was compensated for such injury under the WCA could not bring a common law claim for resulting impotency).

Other than standing for the unremarkable and general proposition that the ODA's exclusivity provision funnels virtually all claims for compensation for workplace injuries through the workers' compensation administrative process; that exclusivity provisions have been strictly construed; and, broadly speaking, that our courts have resisted efforts to formulate exceptions to the exclusive remedy mandate, the decisions relied upon by the University offer limited insight to our resolution of the present matter.

Indeed, unlike the instant matter, in each of these decisions, the claimant was deemed to be entitled, at least to some degree, to compensation for his or her work-related injury under the WCA or ODA. Moreover, our decisions in *Barber*, *Poyser*, and *Kline* were issued prior to our watershed decision in *Tooey*. The same can be said of other decisions that the University relies upon, such as *Moffett v. Harbison-Walker Refractories, Co.*, 14 A.2d 111 (Pa. 1940), and *Sedlacek*, *supra*, which spoke in even

stronger terms regarding the breadth of the exclusivity provision, but whose holdings were undermined by our subsequent decision in *Tooey*.

Sharpening the point that these decisions are of limited value in this appeal, *Franczyk*, which again emphasized the strength of the WCA's exclusivity provision, and in which a claimant received compensation under the WCA for a dog bite, involved a claimant's attempt to sue her employer, outside of the workers' compensation system, for interfering with her ability to bring an action against a third party. Based upon the breadth of the WCA's exclusivity provision, we rejected such an attempt. Our recent decision in *Franczyk*, however, in no way diminished the import of *Tooey*; indeed, it neither discussed nor cited *Tooey*, let alone suggested a retreat from *Tooey*'s holding. As *Barber*, *Poyser*, and *Kline* dealt with issues regarding a lack of compensation distinct from an employee's total inability to recover compensation, they do not significantly inform our decision, and we conclude that *Tooey* remains the most relevant decision to our analysis.[18]

In the same vein, Executor points to our decisions in *Greer v. United States Steel*, 380 A.2d 1221 (Pa. 1977), and *Pollard*, *supra*, which we likewise observe are of limited assistance. In *Greer*, our Court was faced with the question of whether an employee suffering from pulmonary fibrosis, allegedly contracted in the course of his employment,

---

[18] The Third Circuit's decision in *Weldon v. Celotex Corporation*, 695 F.2d 67 (3d Cir. 1982), also fails to advance our analysis in a meaningful fashion. Therein, the court offered that the time limitations provided in the ODA did not restrict coverage for those diseases that were set forth in the statute, but only limited the time within which the claims would be recognized. The court concluded that the claimant's asbestosis and death were within the coverage of the statute, and, thus, even though his illness did not manifest within the ODA's limitation period, he nevertheless was barred from bringing a common law claim against his employer. *Id.* at 71. First, the Third Circuit in *Weldon* did what federal courts do when interpreting a diversity case involving Pennsylvania state law — they predict the state of Pennsylvania law. However, the *Weldon* decision was rendered in 1982, 40 years before our decision in *Tooey*, and, thus, the court did not have the benefit of that decision in forming its exclusivity analysis. At any rate, *Weldon* is a federal circuit court decision that is not binding on us.

could bring a civil action. It was undisputed that common law recovery was precluded if recovery for the injury could be achieved under the ODA, and we surmised that the converse would be true as well: that recovery in common law would not be barred if recovery could not be had under the ODA. Thus, we remanded for a determination of whether the claimant's disease constituted an occupational disease under the ODA. Similarly, in *Pollard*, the Court was faced with the question of whether an employee's civil action against his employer for cancer acquired through his employment could proceed before there was a final administrative determination regarding compensability under the WCA or ODA. The plurality reasoned that the employee's common law action was not barred until there was a final determination that the injury or disease was cognizable under either statute. The plurality remanded the matter, explaining that, "if it is determined that decedent's nodular lymphoma is compensable, then [the employee's] common law action is barred. Conversely, if the facts do not warrant such a finding, [the employee's] common law cause of action may be maintained." *Pollard*, 695 A.2d. at 769. Like the cases proffered by the University, the cases pointed to by Herold — permitting an action in common law for work injuries not encompassed by the workers' compensation law — provide only limited value to our inquiry as to whether a disability or death resulting from an occupational disease which is non-compensable is subject to the ODA's exclusivity provision.

We are further mindful that "the General Assembly intends the entire statute to be effective and certain." 1 Pa.C.S. § 1922(2). Here, certain provisions in the ODA suggest a broad sweep for the statute's exclusivity provision. Specifically, Section 1201 of the ODA sets forth that the statute "shall apply to disabilities and deaths caused by occupational disease as defined in [the ODA]." 77 P.S. § 1201. Additionally, Section 1403 requires parties to surrender "their rights to any form or amount of compensation or

damages for *any* disability or death resulting from occupational disease, or to any method of determination thereof," other than provided in the ODA. 77 P.S. § 1403 (emphasis added). However, the right to compensation is infused throughout the ODA. It is, as noted above, one of the two pillars of the Grand Bargain, and is reflected in both Section 1401, which requires that "compensation for disability or death of such employe, caused by occupational disease, arising out of and in the course of his employment, shall be paid by the employer, without regard to negligence, according to the schedule contained" thereafter, 77 P.S. § 1401(a), as well as Section 1403, which requires the "surrender by the parties . . . of their rights to any form or amount of compensation or damages for any disability or death resulting from occupational disease, or to any method of determination thereof." 77 P.S. § 1403. Thus, the General Assembly's intent to make the entire statute effective and certain suggests a reading that requires compensation, even if limited.

Additional tools of statutory construction aid our analysis. First, it is the Court's settled policy to resolve claims on non-constitutional grounds, when possible. *See, e.g.*, *Commonwealth v. Long*, 922 A.2d 892, 897 (Pa. 2007). While Executor raised and preserved the constitutionality of the ODA's exclusivity provision (should it be deemed to bar relief), we find that we need not directly entertain the question. Rather, we consider the constitutional issue as an aid in ascertaining the intent of the General Assembly regarding the breadth of the ODA's exclusivity provision.

Specifically, the Statutory Construction Act commands that the legislature does not intend to violate the Pennsylvania Constitution or the United States Constitution. 1 Pa.C.S. § 1922(3). Indeed, the history of the constitutionality of workers' compensation laws at the federal and state level reveal an intent, indeed, a requirement, for

compensation, as well as an exclusive process outside of the common law for resolving claims for work injuries.[19]

The Pennsylvania constitutional experience suggests that, for the workers' compensation system to be constitutional, there must be reasonable compensation, but permits an exclusive remedy process to replace the civil tort system. Specifically, to

[19] At the federal level, state workers' compensation legislation was immediately met with constitutional challenges. After New York's workers' compensation law was struck as unconstitutional, later, in 1917, the Supreme Court of the United States upheld New York's reenacted workers' compensation statute against a federal due process challenge as an acceptable substitute for tort remedies — so long as that substitute did not contravene the 14th Amendment. The Court explained that liability without fault was not new to the law, and that the no-fault liability process was not violative of the 14th Amendment. Its rationale, however, was based, in part, upon the concept of guaranteed compensation:

> [I]t perhaps may be doubted whether the state could abolish all rights of action, on the one hand, or all defenses, on the other, without setting up something adequate in their stead. No such question is here presented, and we intimate no opinion upon it. The statute under consideration sets aside one body of rules only to establish another system in its place. If the employee is no longer able to recover as much as before in case of being injured through the employer's negligence, *he is entitled to moderate compensation in all cases of injury, and has a certain and speedy remedy without the difficulty and expense of establishing negligence or proving the amount of damages.*

*New York Central Railroad v. White*, 243 U.S. 188, 201 (1917) (emphasis added). Sharpening the point of an absolute duty to compensate an injured employee, the high Court rejected a claim of unconstitutional arbitrariness:

> Viewing the entire matter, it cannot be pronounced arbitrary and unreasonable for the state to impose upon the employer the **absolute duty of making a moderate and definite compensation in money to every disabled employee, or, in case of his death,** to those who were entitled to look to him for support, in lieu of the common-law liability confined to cases of negligence.

*Id.* at 205 (emphasis added); *see generally* Spieler, 69 Rutgers U.L. Rev. at 907; Williams, 69 Rutgers U.L. Rev. at 1090.

ensure that the popular and anticipated workers' compensation legislation would be constitutional, in 1915, its proponents succeeded in having the state constitution amended to allow for a compulsory law to substitute for the ensconced rights to a common law remedy. Article III, Section 18 of the Constitution empowered the legislature, if it deemed appropriate, to enact laws to compensate for workplace injuries or diseases, including those that cause the death of an employee. Specifically, Article III, Section 18 — formerly Article III, Section 21[20] — was amended, by preceding its prohibitory language with the following declaration:

> The General Assembly may enact laws ***requiring the payment by employers, or employers and employees jointly, of reasonable compensation for injuries to employees arising in the course of their employment, and for occupational diseases of employees, whether or not such injuries or diseases result in death, and regardless of fault of employer or employee***, and fixing the basis of ascertainment of such compensation and the maximum and minimum limits thereof, and providing special or general remedies for the collection thereof; but in no other cases shall the General Assembly limit the amount to be recovered for injuries resulting in death, or for injuries to persons or property, and in case of death from such injuries, the right of action shall survive, and the General Assembly shall prescribe for whose benefit such actions shall be prosecuted. No act shall prescribe any limitations of time within which suits may be brought against corporations for injuries to persons or property, or for other causes different from those fixed by general laws regulating actions against natural persons, and such acts now existing are avoided.

Pa. Const. art. III, § 18 (emphasis added).

Section 18 sets forth the fundamental authorization requirements for workers' compensation laws in Pennsylvania. Only by virtue of Section 18 — requiring the

---

[20] The section was renumbered as Article III, Section 18, in the course of the 1968 constitutional convention.

payment by employers of reasonable compensation for workplace injuries — was the General Assembly authorized to replace traditional common law rights and create distinct proceedings and recoveries for work-related injuries that in any other context would be beyond its legitimate authority. *East v. Workers' Compensation Appeal Board (USX Corporation/Clairton)*, 828 A.2d 1016, 1021 (Pa. 2003).

Given that manifest purpose to enshrine in our Constitution the guarantee that injured workers will receive some compensation for any injury sustained in the course of employment, we simply recognize that an interpretation of Section 1403 that would make a work-related injury non-compensable and extinguish any forum in which to recover compensation from an employer for that injury, would arguably be in tension with Section 18's requirement that employers pay reasonable compensation for injuries to employees arising in the course of their employment. Furthermore, an interpretation that would bar workers from any forum in which to recover damages for a workplace injury or preclude a worker from receiving any amount of relief would raise serious questions regarding the constitutionality of that system in light of our Constitution's Open Court and Remedies Clause, Article I, Section 11,[21] and Due Process and Equal Protection protections provisions. *Cf. Dolan v. Linton's Lunch*, 152 A.2d 887, 892 (Pa. 1959) ("To read the act so as to deny plaintiff his existing common-law remedy without permitting him to come within the protective coverage of the Workmen's Compensation Act might well violate the mandate of Article I, Section 11 of the Constitution of Pennsylvania."); *Greer*, 380 A.2d at 1222-23 ("It has even been pointed out that an attempt to bar recovery where no compensation recovery can be had might well violate Article I, Section 11, of the

---

[21] Article I, Section 11 provides: "All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct." Pa. Const. art. I, § 11.

Constitution."). Accordingly, interpreting the ODA's exclusivity provision so as to not vitiate all recovery avoids a potential constitutional infirmity.[22]

Finally, we consider the consequences of a particular interpretation. 1 Pa.C.S. § 1921(c)(6). The manifest consequence of the University's interpretation of the ODA's exclusivity provision is that it would prohibit an injured employee from filing an action at common law, despite the fact that the employee has no opportunity to seek redress under the ODA. This interpretation would operate as a *de facto* exclusion of coverage under the Act for essentially all mesothelioma claims and leave an injured worker with *no remedy* against his or her employer. That being the case, the efficacy of the Grand Bargain, upon which all workers' compensation laws are based, would be in jeopardy.

---

[22] Another tool of statutory construction employed in discerning the intent of the General Assembly requires a court to apply a strict or liberal construction depending upon the type of statute. 1 Pa.C.S. § 1928. With respect to workers' compensation, our Court has made clear that, as the goal of the WCA is to make an injured employee whole, the legislation is "remedial in nature and its purpose is to benefit the workers of this Commonwealth" and is to be "liberally construed to effectuate its humanitarian objectives" and "borderline interpretations of the Act are to be construed in the injured party's favor." *Sporio v. Workers' Compensation Appeal Board (Songer Construction)*, 717 A.2d 525, 528 (Pa. 1998); *see also Lancaster General Hospital v. Workers' Compensation Appeal Board (Weber–Brown),* 47 A.3d 831, 839 (Pa. 2012). Thus, when a statutory provision is ambiguous, "it will be construed to favor the worker and his or her right to benefits." David B. Torrey, *The Commonwealth Court of Pennsylvania and the Workers' Compensation Act: Background and Jurisprudence, Judge Alexander F. Barbieri, and Selected Precedents*, 20 Widener L.J. 87, 106 (2010). Likewise, it is well-settled that the ODA must be liberally construed to effectuate its remedial and humanitarian purposes. *Bley v. Department of Labor and Industry*, 399 A.2d 119, 122 (Pa. 1979).

However, we recognize that moderating such a liberal interpretation is the legislature's declaration that statutory remedies are preferred over those provided by the common law. 1 Pa.C.S. § 1504 ("In all cases where a remedy is provided or a duty is enjoined or anything is directed to be done by any statute, the directions of the statute shall be strictly pursued, and no penalty shall be inflicted, or anything done agreeably to the common law, in such cases, further than shall be necessary for carrying such statute into effect."); 1 Pa.C.S. § 1928(a) ("rule that statutes in derogation of the common law are to be strictly construed, shall have no application to the statutes of this Commonwealth enacted finally after September 1, 1937"). Thus, as the ODA was enacted in 1939, the remedy directed to be "done" by the ODA is to be strictly pursued.

The employee would not receive certain but limited compensation for his work injury, and an employer would be granted full immunity from all liability.[23]

Conversely, Executor's interpretation of the ODA's exclusivity provision would result in employers who have relied upon its insulating effect being exposed to potentially significant financial liability, which undermines their part of the Grand Bargain. This potential financial liability could be exacerbated if an employer has not obtained insurance to cover work-related claims arising outside of the ODA. Furthermore, in this matter, the University claims that subjecting it to significant financial liability would undermine its mission — education and research.

The University's claim of liability in "unlimited amounts" and financial ruin, however, must be tempered by other considerations. Appellant's Brief at 52. Replacing the exclusive remedy doctrine with a tort system is hardly a panacea for injured workers. In bringing a negligence action, an injured worker would be tasked with establishing duty, breach, causation, and ultimate liability, and be subjected to any and all of an employer's common law defenses. An employer may have the financial resources to withstand a protracted lawsuit, while an injured worker may not. Furthermore, compared to the certain but limited compensation guaranteed under the ODA, an injured worker risks recovering nothing after a jury trial. Moreover, injured workers unsuccessful in court would be forced to rely on health insurance and short-term or long-term disability coverage to protect against medical bills and lost income. Many workers are simply not covered by these benefits. If an uninsured worker did not succeed in tort, they would have no other recourse.

---

[23] We note however that, here, Herold, potentially like other individuals who suffer from mesothelioma, has brought his civil action against non-employers as well as the University. Thus, he could be awarded damages from the non-employer defendants for his disease, even if his claim against the University was not barred by the ODA.

Yet, an injured worker may be awarded a significant amount of compensation for his work-related disease. While employers are required to obtain insurance or be self-insured for workers' compensation liability, here, the University asserts that its reliance upon the ODA's exclusivity provision has left it without insurance. Moreover, according to the University, if Executor's interpretation was to prevail, obtaining such insurance would be difficult.

Considering all of the statutory construction factors discussed above, we find they weigh in favor of interpreting the ODA's exclusivity provision to not preclude a common law civil action against an employer for disability or death resulting from an occupational disease and which occurs four years after the last date of employment in the relevant occupation or industry.

Such an interpretation reflects the centrality of the Grand Bargain. Under that foundational understanding, workers' compensation laws were to serve as a *substitute* for a substantive tort right under the common law, and, thus, *some* remedy for workplace injury was contemplated. Duff, 87 Pa. B.A. Q. at 22. As we made clear in *Barber*, "[t]he employer, in exchange for immunity from lawsuits by injured employees, provides certain and reasonable compensation to injured employees without regard to fault." *Barber*, 555 A.2d at 769. If the ODA is interpreted to shield an employer from all potential liability, the *quid pro quo* would be vitiated. When there is no possibility of compensation, the Grand Bargain is no bargain.

Moreover, leaving such employees with *no remedy* against his or her employer contravenes the ODA's intended purpose. As we stated in *Tooey*, "[i]t is inconceivable that the legislature, in enacting a statute specifically designed to benefit employees, intended to leave a certain class of employees who have suffered the most serious of work-related injuries without any redress under the Act or at common law." *Tooey*, 81

A.3d 864; *see Dolan*, 152 A.2d at 892-93 ("Nowhere in this latter provision is the General Assembly authorized to enact a law which vitiates an existing common-law remedy without concurrently providing for some statutory remedy. Of course, the substituted remedy need not be the same, but that is far different from saying that no remedy at all may be substituted." (footnote omitted)).

Thus, we conclude that the General Assembly intended that the ODA's exclusivity provision found in Section 1403 be interpreted in light of Section 1401. Specifically, Section 1401 defines "compensable disability or death" with a temporal component — *i.e.*, to be compensable, the disability or death resulting from an occupational disease must occur within four years after the date of last employment. 77 P.S. § 1401(c). Here, Section 1403 states that the ODA operates as a "surrender by the parties thereto of their rights to any form or amount of compensation or damages for any disability or death resulting from occupational disease, or to any method of determination thereof." 77 P.S. § 1403. Reading these provisions together, to be subjected to the ODA's exclusivity provision, an injured worker must have some potential compensation to surrender.

Accordingly, giving fidelity to the *quid pro quo* that is the Grand Bargain, we hold that the ODA's exclusivity provision extends only to those claims asserting a *compensable* disability or death, *i.e.*, a disability or death resulting from an occupational disease and which occurs within four years after the date of an employee's last employment; thus, claims by an injured worker related to disability or death resulting from an occupational disease and which occur outside of the four-year period are not barred by the exclusivity provision, and such an employee may seek compensation against his employer in a common law civil action.[24]

---

[24] We fully recognize that statutes providing compensation for workplace injuries constitute social legislation, and that social policy is largely within the legislature's domain. (continued…)

Having concluded that a civil claim related to disability or death resulting from an occupational disease and which occurs outside of the ODA's four-year limitations period is not barred by the ODA's exclusivity provision, we turn to the University's argument that, even if a common law claim survives outside of the ODA, such a plaintiff must still file a claim within the workers' compensation system, pursuant to the primary jurisdiction doctrine.

The doctrine of primary jurisdiction is jurisprudential, and centers on the relationship between the courts and administrative agency tribunals for which it is assumed, in appropriate circumstances, the courts may benefit from the agency's views on issues within the agency's competence. *See Weston v. Reading Co.*, 282 A.2d 714 (Pa. 1977). In *Weston*, we stated:

> The principles of the doctrine of primary jurisdiction are well settled. The United States Supreme Court "... recognized early in the development of administrative agencies that coordination between traditional judicial machinery and these agencies was necessary if consistent and coherent policy were to emerge.... The doctrine of primary jurisdiction has become one of the key judicial switches through which this current has passed." *Port of Boston Marine Terminal Ass'n. v. Rederiaktiebolaget Trans-Atlantic*, 400 U.S. 62, 68, 91 S.Ct. 203, 208, 27 L.Ed.2d 203 (1970) (footnote and citations omitted). The doctrine "... requires judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 63, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). (further citations omitted).

282 A.2d at 723 (alterations original). The doctrine serves several purposes, including fostering an agency's special experience and expertise in complex areas of the law with

---

Finding the ODA's exclusivity provision to be ambiguous, we base our decision today on application of the tools of statutory construction provided by the legislature itself.

which judges and juries lack familiarity, respecting the statutory creation of administrative agencies, and promoting consistency and uniformity in administrative law. *Elkin v. Bell Telephone Company of Pennsylvania*, 420 A.2d 371, 376-77 (Pa. 1980).

Our Court has explained, however, that the judiciary must be cautious in abstaining "whenever a controversy remotely involves some issue falling arguably within the domain of the agency's 'expertise,'" as such expertise "is no talisman dissolving a court's jurisdiction. Accommodation of the judicial and administrative functions does not mean abdication of judicial responsibility." *Id.* at 377. Indeed, our Court warned that "the so-called 'expert' looms ominously over our society — too much so to permit the roles of the court and jury to be readily relinquished absent a true fostering of the purposes of the doctrine of primary jurisdiction." *Id.*

Simply stated, when the subject of a dispute is within an agency's scope, and where the matter requires special knowledge and experience — with which a judge or jury would not have familiarity — referral of the action to the relevant agency is proper. Conversely, where a matter is not one uniquely within an agency's area of expertise, but is one in which the judiciary is equally adept at resolving, a court should not relinquish its traditional jurisdiction.

As persuasively explained by the Commonwealth Court below, the instant matter does not involve complex or technical questions requiring special competence with which a judge or jury would be unfamiliar. Rather, it involves a straightforward factual determination of whether Herold's death resulted from an occupational disease, and when it occurred. 77 P.S. § 1401(c). These determinations are commonplace in civil trials; they are not peculiarly within the expertise of workers' compensation authorities. Here, Executor provided evidence that Herold's mesothelioma was diagnosed more than four years after his last workplace exposure to asbestos, and he died more than four years

from his last date of employment with the University.[25] The University does not seriously contest that Herold contracted mesothelioma, and, indeed, contends that mesothelioma should be covered by the ODA. *See* Appellant's Brief at 44-45. Likewise, the University does not dispute the date Herold died. While certain determinations involving a disability or diagnosis may require findings of fact, here, the legal ramifications flowing from these

---

[25] Executor asserts that Herold's mesothelioma is excluded from the jurisdiction of the ODA by the temporal limitation of Section 1401, which acts as a *de facto* exclusion of coverage for occupational diseases that do not cause total disability or death within four years of the employee's last *exposure* to asbestos. Appellee's Brief at 7. Executor maintains that the focus of this limitations period is the date of death (as he is not claiming any disability). According to Executor, Herold's mesothelioma did not occur and cause death within four years of his date of last exposure *or* his last date of employment. *Id.* at 7. On an even more granular level, Executor claims that, if the date of employment is the trigger, it is the last date of employment in the occupation in which an injured worker is exposed to the hazard. Specifically, Executor offers that Herold worked as a stationary engineer for the University and his last date of occupation in which he was exposed to asbestos was 2004. His exposure to asbestos ended in 2004 when he became a foreman at the University's North Campus, and ultimately worked remotely from February 2015 until July 2015, when he voluntarily retired from the workforce. As Herold died in 2022, Executor contends his death resulting from an occupational disease did not occur within four years after his last exposure or his date of last employment in an occupation in which he was exposed.

The University argues that Section 1401 does not include a reference to exposure, but, rather, claims that the four-year time limitation on compensable disease or death begins from the last date of *employment* rather than the last date of *exposure*. Appellant's Brief at 42-43. The University contrasts this with the WCA which finds the limitations period to be triggered when a disability or death resulting from an occupational disease "occur[s] within three hundred weeks after the last date of employment in an occupation or industry to which he was exposed to hazards of such disease[.]" 77 P.S. § 411(2); *see Sporio,* 717 A.2d 525, 528 (finding 300-week period begins on the last day of employment-based exposure to the hazard); *Cable v. WCAB (Gulf Oil/Chevron USA),* 664 A.2d 1349, 1351 (Pa. 1995) (plurality) (reasoning that "period of exposure, not the total period of employment, is the governing factor").

Here, Herold's death (the triggering event, as Executor is not seeking compensation for Herold's disability and Herold was not disabled when he retired) did not occur until well beyond four years after either his last date of exposure, his last date of employment in an occupation in which he was exposed to asbestos, or his last date of employment in the industry. Thus, Executor's claim is not compensable under the ODA as a matter of law.

facts lead to the conclusion that Executor's claim is not compensable under the ODA and that the trial court has jurisdiction over this matter as a matter of law. This being the case, we conclude that the doctrine of primary jurisdiction should not be applied in this matter.

Order affirmed. Case remanded to the Commonwealth Court for remand to the trial court for further proceedings consistent with our decision today. Jurisdiction relinquished.

Justices Donohue, Dougherty, Mundy and McCaffery join the opinion.

Justice Wecht files a dissenting opinion.

Justice Brobson files a dissenting opinion.